

U.S. Department of Justice

Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W., Rm:7244
Washington, D.C. 20530-3001

Tel: (202) 514-1927
Fax: (202) 514-7964

DNL:CWScarborough
# 46-76-2005

January 4, 2012

Lyle Cayce
Clerk, United States Court of Appeals
  for the Fifth Circuit
United States Courthouse
600 S. Maestri Place
New Orleans, LA 70130

Re: *United States ex rel. Gonzalez v. Fresenius Medical Care, et al.*, No. 10-50413

Dear Mr. Cayce:

Pursuant to Fed. R. App. P. 28(j), the United States respectfully calls the panel's attention to two recent decisions (decided after the close of briefing in this appeal) holding that the False Claims Act extends to kickback schemes that cause the submission of claims to Medicare for medical services, devices, or drugs tainted by kickbacks:  *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377 (1st Cir. 2011), cert denied, 2011 WL 3841271 (Dec. 5, 2011); *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295 (3d Cir. 2011).

In *Blackstone*, the First Circuit reversed the dismissal of a *qui tam* suit alleging that a medical device manufacturer paid kickbacks to various doctors to use its devices, which in turn caused hospitals to submit claims to Medicare for services tainted by kickbacks.  In so doing, the First Circuit confirmed that compliance with the Anti-Kickback Statute ("AKS") is a fundamental condition of payment under Medicare and that claims for services tainted by kickbacks may be impliedly false even though this condition is not expressly set forth in a statute or regulation.  *Blackstone*, 647 F.3d at 386-88.  The court also held that "certifications" of compliance with the AKS made by third parties with no knowledge of any kickbacks (in that case, hospitals) do not "immunize a non-submitting entity from liability under the 'causes' clauses of the FCA," *id*. at 390, because kickback-tainted claims are false simply because they do not comply with a condition of payment.  *Blackstone* thus supports the United States' arguments in this appeal that the district court erred in holding that the lack of express certifications of compliance with the AKS precludes FCA liability, U.S. Br. at 16-24, and that the court erred in treating the question whether compliance with the AKS is a condition of payment as a question of fact, *id*. at 24-26.

In *Wilkins*, the Third Circuit likewise reversed the dismissal of a *qui tam* suit premised in part on violations of the AKS.  Rejecting the district court's conclusion that the relator was

required to allege that the defendant certified its compliance with the AKS, the Third Circuit held that the relator could proceed under an implied certification theory. *Wilkins*, 659 F.3d at 313. Under that theory, the court explained, the relators were only required "to allege, as they did, that [defendants] submitted claims for payment to the Government at a time that they knowingly violated a law, rule, or regulation which was a condition for receiving payment from the Government." *Ibid*. Thus, *Wilkins* also supports the United States' arguments that no express certifications of compliance with the AKS are required in order to state a claim under the FCA, U.S. Br. at 16-24, and that the implied certification theory of liability encompasses claims for services tainted by kickbacks, because compliance with the AKS is a fundamental condition of payment under Medicare, and all claims for payment to federal health care programs contain implicit representations of compliance with that condition, *id*. at 26-30.

Oral argument in this case is now scheduled for February 8, 2012. We request that copies of this letter be submitted to the panel assigned to this case at your earliest convenience.

Sincerely,

<u>s/ Charles W. Scarborough</u>
CHARLES W. SCARBOROUGH
Attorney, Appellate Staff
Civil Division

cc: Counsel of Record (via ECF)

ordered further briefing. Between the bankruptcy court's rejection of a damages hearing and the easily obtained transcript's showing that the status conference did not allow for the presentation of evidence, there is more than enough for us to conclude, as we do, that the court improperly denied the Debtors an opportunity to prove damages.

Wrapping up, we note that the bankruptcy court's decision itself shows why such an opportunity is necessary. The record reveals no clear foundation for the bankruptcy court's conclusion that damages were unwarranted. The court only suggested that the adversary proceeding was "like an avoidance action," but did not otherwise support its conclusion that cancellation of the mortgage was a sufficient remedy for the willful violation. And the court gave no explanation for disregarding the statute's language mandating the recovery of costs and attorneys' fees. The court's conclusion is rooted in neither record nor statute, and an analogy unsupported by any evidence is not enough to justify its decision to disregard the statute's mandatory language and deny damages.

### Conclusion

For the reasons set forth above, we *reverse* the bankruptcy court's denial of a hearing on damages, *vacate* its rejection of damages, and *remand* for the parties to present evidence on damages. Costs are taxed in favor of the appellants.



---

**UNITED STATES of America ex rel. Susan HUTCHESON and Philip Brown, Plaintiffs, Appellants,**

**v.**

**BLACKSTONE MEDICAL, INC., Defendant, Appellee.**

**No. 10–1505.**

United States Court of Appeals, First Circuit.

Heard April 6, 2011.

Decided June 1, 2011.

**Background:** Relator filed action against medical device manufacturer under the qui tam provisions of the False Claims Act (FCA). Manufacturer moved to dismiss for failure to state a claim and for transfer of venue. The United States District Court for the District of Massachusetts, William G. Young, J., 694 F.Supp.2d 48, denied transfer and granted dismissal. Relators appealed.

**Holding:** The Court of Appeals, Lynch, Chief Judge, held that allegations were sufficient to state a claim under FCA.

Reversed and remanded.

**1. Federal Courts ⟷776, 794**

Court of Appeals reviews de novo the grant of a motion to dismiss for failure to state a claim, accepting as true all well-pleaded facts, analyzing those facts in the light most hospitable to the plaintiff's theory, and drawing all reasonable inferences for the plaintiff. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**2. United States ⟷120.1**

A claim may be false or fraudulent, in violation of False Claims Act (FCA), due to an implied representation of compliance with a precondition of payment that is not expressly stated in a statute or regulation. 31 U.S.C.A. § 3729.

### 3. United States ⬤120.1

When the defendant in an False Claims Act (FCA) action is a non-submitting entity, the question is whether that entity knowingly caused the submission of either a false or fraudulent claim or false records or statements to get such a claim paid; the FCA makes no distinction between how non-submitting and submitting entities may render the underlying claim or statements false or fraudulent. 31 U.S.C.A. § 3729.

### 4. United States ⬤122

Relator's allegations that physicians failed to comply with hospital's provider agreement and cost report forms stating that payment from Medicare was conditioned on compliance with Anti-Kickback Statute, by receiving kickbacks from medical device manufacturer in exchange for use of manufacturer's devices in surgery, were sufficient to state a claim that the hospital and physician claims for Medicare payment were materially false or fraudulent, in violation of False Claims Act (FCA). 31 U.S.C.A. § 3729; Social Security Act, § 1128B(b), 42 U.S.C.A. § 1320a–7b(b).

### 5. United States ⬤120.1

Express contractual language may constitute dispositive evidence of materiality of a false statement, for purposes of liability under False Claims Act (FCA), but materiality may be established in other ways, such as through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue. 31 U.S.C.A. § 3729.

———

Jennifer M. Verkamp, with whom Frederick M. Morgan, Jr. and Morgan Verkamp LLC, were on brief, for appellants.

Charles W. Scarborough, Appellate Staff, Civil Division, Department of Justice, with whom Tony West, Assistant Attorney General, Carmen Ortiz, United States Attorney, and Douglas N. Letter, Appellate Staff, Civil Division, Department of Justice, were on brief, for the United States, amicus curiae.

Catherine E. Stetson, with whom Peter S. Spivack, Jonathan L. Diesenhaus, Jessica L. Ellsworth, Lillian S. Hardy, Stephanie L. Carman, Hogan Lovells U.S. LLP, Douglas Hallward–Driemeier, Kirsten V. Mayer, and Ropes & Gray LLP, were on brief, for appellee.

Before LYNCH, Chief Judge, LIPEZ and HOWARD, Circuit Judges.

LYNCH, Chief Judge.

In this qui tam action brought under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, relator Susan Hutcheson appeals from a Rule 12(b)(6) dismissal of her claims against Blackstone Medical, Inc. (Blackstone).

Hutcheson argues that Blackstone "knowingly" "cause[d]" hospitals and physicians to submit materially "false or fraudulent" claims to Medicare, Medicaid, and TRICARE in violation of 31 U.S.C. § 3729(a)(1) & (2). She alleges that Blackstone engaged in a nationwide kickback scheme to induce physicians to use its medical devices in spinal surgeries and that Blackstone knew this scheme would cause physicians and hospitals (unwittingly) to present federal healthcare programs with payment claims that contained material misrepresentations. We need only address Hutcheson's claims as they relate to the Medicare program. The United States has not intervened in this suit brought on

its behalf, though it has supported Hutcheson as an amicus, both in the district court and on appeal.

Hutcheson and the United States argue that a claim is "false or fraudulent" under the FCA if it does not meet a material precondition of payment. They argue that compliance with the Anti–Kickback Statute (AKS), 42 U.S.C. § 1320a–7b, is a precondition for Medicare reimbursement and thus that Blackstone, in providing the alleged kickbacks, caused the hospitals and physicians at issue in this suit to submit false or fraudulent claims. In making this argument, Hutcheson and the United States invoke both the specific terms of provider agreements and hospital cost reports as well as elements of the broader statutory scheme. They argue, moreover, that the hospital and physician claims at issue in this suit were *materially* false or fraudulent because the alleged kickbacks would have been capable of influencing Medicare's decision whether to pay the claims had it been aware of them.[1]

Blackstone argues that a claim can only be false or fraudulent under the FCA if it (1) misstates facts, (2) incorrectly certifies compliance with a statute or regulation, or (3) does not meet an express condition of payment stated in a statute or regulation. Blackstone argues that the claims at issue here do not meet any of these criteria. It argues that Hutcheson has neither alleged that the claims contain factual misstatements, nor identified an express certification or an express condition of payment from a statute or regulation that would disallow payment in light of the alleged kickbacks. Blackstone also argues that even if the claims were false or fraudulent, they were not *materially* false or fraudulent because the claims made by hospitals

and the services provided by physicians were not influenced by kickbacks.

The district court held that Hutcheson's allegations did not state a claim under the FCA for purposes of Rule 12(b)(6). *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 694 F.Supp.2d 48 (D.Mass. 2010). It held that the hospital claims were not false or fraudulent, and that while the doctor claims were false or fraudulent, those claims were not materially false or fraudulent. We reverse.

After reviewing the facts and the district court's analysis, we reject two purported limitations on FCA liability Blackstone advances, one of which was adopted by the district court and the other of which appears to draw support from the district court's opinion. First, we reject the argument that, in the absence of an express legal representation or factual misstatement, a claim can only be false or fraudulent if it fails to comply with a precondition of payment expressly stated in a statute or regulation. Second, we reject the argument that a submitting entity's representations about its own legal compliance cannot incorporate an implied representation concerning the behavior of non-submitting entities. These purported limitations do not appear in the text of the FCA and are inconsistent with our case law.

Having rejected these two purported limitations, we hold that Hutcheson's complaint, in alleging that the hospital and physician claims represented compliance with a material condition of payment that was not in fact met, states a claim under the FCA that the hospital and physician claims for payment at issue in this case were materially false or fraudulent. It follows that Hutcheson has stated a claim

---

1. Hutcheson and the United States also argue that violations of the AKS inherently render claims to federal healthcare programs materi-

ally false or fraudulent under the FCA. We need not reach this broader argument.

that Blackstone knowingly caused the submission of materially false or fraudulent claims in violation of the FCA. In reaching this conclusion, we do not adopt the judicially created conceptual framework employed by the district court, nor do we adopt any categorical rules as to what counts as a materially false or fraudulent claim under the FCA.

## I.

Hutcheson was employed by Blackstone as a Regional Manager from January 2004 until she was terminated in January 2006. She filed this qui tam action against Blackstone on September 29, 2006.[2] On November 21, 2008, more than two years later, the case was unsealed after the United States filed a notice stating that it would not intervene at that time because it was still investigating the claim.

At the time Hutcheson filed her complaint, the FCA imposed liability on any person who either "knowingly presents, or causes to be presented to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," *id.* § 3729(a)(2). A person acts "knowingly" if he or she "(1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b). The FCA also stated that the term "knowingly" requires "no proof of specific intent to defraud." *Id.* The statute has since been amended, but we refer to the provisions in force at the time of filing.[3]

Hutcheson's complaint alleges that Blackstone paid kickbacks to doctors across the country so they would use its products in certain spinal surgeries. These kickbacks, Hutcheson alleges, included "monthly payments under sham consulting agreements; paid development projects; research grants; royalties; exorbitant and sometimes illicit entertainment expenses; high-end travel and accommodations; speaking engagements and seminars[;] and other illegal incentives." Hutcheson alleged that Blackstone's man-

---

2. Originally, Philip Brown was also named as a relator in this suit. Brown worked as an independent distributor for Blackstone in 2004. The district court dismissed Brown for failure to satisfy the "original source" requirement of 31 U.S.C. § 3730(e)(4)(B), and that dismissal has not been appealed.

3. In 2009, Congress passed the Fraud Enforcement Recovery Act (FERA), Pub.L. No. 111–21, 123 Stat. 1617 (2009), which amended the FCA and re-designated § 3729(a)(1) as § 3729(a)(1)(A), § 3729(a)(2) as § 3729(a)(1)(B), and § 3729(b) as § 3729(b)(1)(A) & (B). Hutcheson's amended complaint cited to the re-designated FCA provisions. In dismissing Hutcheson's complaint, the district court did not address the application of FERA to the FCA.

   Under the revised provisions, FCA liability attaches to any individual who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). The amended § 3729(b) is identical to the prior version except for internal subdivisions.

   We have recognized that § 3729(a)(1)(B), but not § 3729(a)(1)(A), was made retroactive to "all claims" under the FCA pending on or after June 7, 2008. *United States ex rel. Loughren v. Unum*, 613 F.3d 300, 306 n. 7 (1st Cir.2010) (quoting FERA § 4(f), 123 Stat. at 1625). We have not addressed the meaning of "claims" under FERA, and we need not do so here. Neither party argues that § 3729(a)(1)(B) is relevantly different from the earlier provision.

agement supervised the kickback scheme and "knew that Medicare, Medicaid, and other federal program beneficiaries represent a significant percentage of spine-surgery patients," and that as a result of the kickbacks, doctors across the country had performed spinal surgeries on Medicare and Medicaid patients using Blackstone's devices.

Hutcheson argues that compliance with the AKS is a condition of receiving payment from federally-funded healthcare programs, including Medicare, Medicaid, and TRICARE. The AKS prohibits the payment and receipt of kickbacks in return for either procuring or recommending the procurement of a good, facility, or item to be paid in whole or in part by a federal healthcare program. 42 U.S.C. § 1320a–7b(b). Hutcheson alleges that through its kickback scheme, Blackstone "knowingly cause[d]" healthcare providers to present "false or fraudulent" claims for payment to federal healthcare programs.[4] The complaint focuses on the submission of claims to Medicare; it only summarily references the submission of claims to Medicaid and TRICARE, so we address these types of claims for payment no further.[5]

The complaint detailed the contents of two types of documents pertinent to the claims for Medicare reimbursement. Both hospitals and physicians must sign a Provider Agreement in order to establish eligibility to receive reimbursement from Medicare. This states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me].... I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

(Alterations in Complaint). Hospitals, but not doctors, must submit a Hospital Cost Report along with their claims for reimbursement. This states:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report [were] provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

The signatory of the Hospital Cost Report must certify:

> To the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws

---

**4.** Hutcheson has not distinguished between the requirements of 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(2). However, she appears to assert a violation under § 3729(a)(1). That sub-section refers to the submission of false or fraudulent claims, while § 3729(a)(2) refers to statements that accompany false or fraudulent claims. We need not reach questions concerning the distinction between these provisions, which have not been asserted by either party.

**5.** As the district court held, Hutcheson's complaint "contains no allegations regarding certifications or requirements" for federal healthcare programs other than Medicare, "such as Medicaid and TRICARE." *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 694 F.Supp.2d 48, 65 (D.Mass.2010).

and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

The federal Centers for Medicare and Medicaid Services (CMS) standardizes these forms. Hutcheson argues that the forms establish that claims for Medicare reimbursement may only be paid if they comply with the AKS. Before the district court, Hutcheson also argued that Congress has independently made clear that compliance with the AKS is a precondition of Medicare payment.

Blackstone moved to dismiss the case,[6] raising three arguments. First, it argued that the complaint was barred by the FCA's first-to-file and public disclosure rules. *See* 31 U.S.C. § 3730(b)(5), (e)(4)(A). Second, it argued that the complaint failed to state a claim under the FCA for purposes of Rule 12(b)(6). Third, it argued that the complaint failed to meet the pleading standard for fraud under Rule 9(b).

The district court held that the case was not jurisdictionally barred by the FCA's first-to-file rule or public disclosure rule. As to the first-to-file rule, it held that under *United States ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13 (1st Cir.2009), the action had sufficiently different facts from a previously filed case, *United States ex rel. Thomas v. Bailey*, No. 4:06CV465, 2008 WL 4853630 (E.D.Ark. Nov. 6, 2008), such that it was not barred. As to the public disclosure rule, it held that though Blackstone's alleged kickback scheme had been publicly disclosed in a complaint in another action, *Berrios v. Blackstone Medical, Inc.*, No.

05–17339 (Brevard Co., Fla., filed May 16, 2005), Hutcheson's claims were not barred because she was an "original source" within the meaning of the FCA. *See* 31 U.S.C. § 3730(e)(4)(B).

On the merits, the district court dismissed Hutcheson's complaint for failure to state a claim under Rule 12(b)(6). Drawing on case law from beyond this circuit, the district court outlined a framework it thought appropriate to analyze claims under the FCA. It held that to state a claim under the FCA, a plaintiff must allege that the defendant "(1) knowingly presented or caused to be presented, (2) a false claim, (3) to the United States government, (4) knowing its falsity, (5) which was material, (6) seeking payment from the federal treasury." *Hutcheson*, 694 F.Supp.2d at 61. The district court's definition of "false," a shorthand for "false or fraudulent," and its definition of "material" are particularly relevant on appeal.

Although the FCA itself does not contain the following distinctions, the district court construed the statute such that a claim is "false or fraudulent" if it is either "factually false" or "legally false." A factually false claim, it held, is a claim "in which the goods or services provided are either incorrectly described, or make [a] claim for a good or service never provided." *Id.* at 62. A legally false claim, it held, is a claim in which "a party certifies compliance with a statute or regulation as a condition to government payment, but did not actually comply with the statute or regulation." *Id.*

The district court further construed the statute such that a claim can be legally false either "under an express certification theory" or "under an implied certification

---

**6.** Blackstone also moved to transfer the case on the ground that it was similar to a then-pending case against Blackstone in the Eastern District of Arkansas, *United States ex rel.*

*Thomas v. Bailey,* No. 4:06CV465, 2008 WL 4853630 (E.D.Ark. Nov. 6, 2008). The district court rejected Blackstone's transfer motion.

theory." *Id.* Under the express certification theory, a claim is false if it expressly certifies compliance with a statute or regulation yet fails to meet the requirements of that statute or regulation. *Id.* Under the implied certification theory, a claim is false when the claimant makes no express certification of "compliance with a statute or regulation, but by submitting a claim for payment, implies that it has complied with any preconditions to payment" contained in statutes or regulations. *Id.* at 63, 66.

The district court also held that claims are "materially" false if they have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" from the government. *Id.* at 64 (quoting *United States ex rel. Longhi v. Lithium Power Techs., Inc.,* 575 F.3d 458, 470 (5th Cir.2009)) (internal quotation marks omitted). It held that "materiality is a separate element of a claim under the [FCA]" such that "analysis of whether the claim is false *vel non* ought not be based on the materiality of the false statement." *Id.* at 63.

Applying this framework, the district court held that Hutcheson's complaint failed to identify a claim that was materially false or fraudulent for purposes of the FCA.[7] The district court divided its analysis between Hutcheson's allegations concerning claims filed by hospitals and her allegations concerning claims filed by physicians.

As to the hospital claims, the district court held that these claims were not false or fraudulent. It did not address the possibility that the claims were factually false. Under the express certification theory, the district court held that (1) the Hospital Cost Report was not specific enough to create an express certification of compli-

ance with the AKS, and (2) although the Provider Agreement created such a certification, "as written, this certification is specific to the party seeking reimbursement." *Id.* at 66 & n. 13. Under the implied certification theory, it held that the relevant statutes and regulations did not expressly condition Medicare payment on compliance with the AKS, and that a precondition to payment "cannot be hidden in an enrollment form." *Id.* at 66.

As to the physician claims, the district court held these claims were not *materially* false or fraudulent. The court held that doctors who, while receiving kickbacks, submitted claims to Medicare for surgeries utilizing Blackstone products, had submitted expressly false certifications of compliance with the AKS. *Id.* It also held that Hutcheson had sufficiently alleged that Blackstone "knowingly caused the submission of these false claims." *Id.* Nonetheless, the district court held that the claims were not materially false or fraudulent because they sought reimbursement for the physicians' services, not for their use of the Blackstone devices. *Id.* at 66–67. The court stated that because Hutcheson had not alleged that the kickbacks induced doctors to submit claims for "medically unnecessary surgeries," the misrepresentations had not influenced the government's payment decisions. *Id.*

## II.

[1] Hutcheson timely appealed and her appeal is supported by the United States. We review de novo the grant of a motion to dismiss under Rule 12(b)(6), accepting as true all well-pleaded facts, analyzing those facts in the light most hospitable to the plaintiff's theory, and drawing all reasonable inferences for the plaintiff. *Ga-*

---

7. In light of this holding, it did not address whether Hutcheson had pled fraud with suffi-

cient particularity under Rule 9(b).

*gliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir.2008). A suit will be dismissed if the complaint does not set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Id.* (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir.2005)) (internal quotation marks omitted).

This appeal concerns whether Hutcheson's complaint identified a false or fraudulent claim that is material within the meaning of the FCA.[8] The parties agree that a claim is false or fraudulent if it contains factual misstatements on its face.[9] They advance different theories as to when a claim is false or fraudulent due to a legal misrepresentation. Hutcheson argues that a claim is false or fraudulent due to legal misrepresentation if it fails to meet a "condition of payment" and there is a "material nexus" between the "wrongful conduct" and "the government's decision to expend funds." Blackstone argues that a claim is false or fraudulent due to legal misrepre-

sentation if it (1) incorrectly certifies compliance with a statute or regulation or (2) fails to meet an express condition of payment stated in a statute or regulation.

We need not weigh the abstract merits of these competing theories. The two theories overlap in significant part: all claims that would be false or fraudulent under Blackstone's theory would also be false or fraudulent under Hutcheson's, but not vice versa. The underlying legal dispute concerns two issues. First, the parties dispute whether a claim may be false or fraudulent for failure to meet an implied legal condition of payment that is found in a source other than a statute or regulation. Second, the parties dispute whether representations made by a submitting entity with respect to its own legal compliance may encompass a legal precondition of payment applicable to non-submitting entities.

## III.

Before we turn to these two purely legal issues and the specific pleadings in

---

8. Blackstone argues that the district court's dismissal may be affirmed on the independent grounds that (1) the suit is barred by the FCA's public disclosure provision and (2) Hutcheson has failed to adequately plead fraud under Rule 9(b). The district court rejected Blackstone's first argument and did not reach its second argument. We reject both of these arguments.

     As to the first argument, it is clear that this action is not barred because Hutcheson was an "original source of the information" under 31 U.S.C. § 3730(e)(4). Blackstone's argument to the contrary primarily concerns whether allegations that either (1) pertained to the time when Hutcheson was not employed by Blackstone, or (2) were added to Hutcheson's amended complaint, thereby failed to meet the "original source" requirements under 31 U.S.C. § 3730(e)(4)(B). Even if those particular allegations are barred, and we do not decide the question, the other allegations remain. As to these remaining allegations, Blackstone only argues that Hutcheson insufficiently alleged that she "provided the

information to the Government before filing" as required by 31 U.S.C. § 3730(e)(4)(B). Hutcheson's complaint stated that she disclosed the allegations to the United States Attorneys' Office for the Middle District of Florida in the "Summer of 2006" "prior to filing." This is more than enough.

     As to the second argument, Rule 9(b) is not a proper alternative ground for affirmance. The district court never considered this argument. It is up to the court in the first instance to weigh the adequacy of the complaint for purposes of Rule 9(b) and, if appropriate, to provide "an opportunity to correct [any] pleading deficiencies." *United States ex rel. Poteet v. Bahler Med., Inc.*, 619 F.3d 104, 115 (1st Cir.2010).

9. The parties describe this state of affairs differently. Hutcheson refers to it as "facial falsity," while Blackstone refers to it as "factual falsity." Both parties contrast this type of falsity with "legal falsity."

Hutcheson's complaint, we comment briefly on the conceptual divisions the district court employed. The district court's analysis turned on distinctions between (1) factually false or fraudulent claims and legally false or fraudulent claims, as well as, (2) claims rendered legally false or fraudulent by an "express certification" and claims rendered legally false or fraudulent by an "implied certification." The parties dispute the value of these distinctions, but this dispute is an abstract one. We decline to employ the district court's categories here.

In adopting these two distinctions, the district court did draw on case law from some other circuit courts. In the context of the FCA's lengthy history, which dates back to its enactment during the Civil War, *see United States v. Rivera*, 55 F.3d 703, 709–10 (1st Cir.1995), these judicially created formal categories are of relatively recent vintage. They have not been adopted by the Supreme Court or this court.

The distinction between factually and legally false or fraudulent claims appears to derive from a 2001 decision of the Second Circuit. *See Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir.2001) (citing Robert Fabrikant & Glenn E. Solomon, *Application of the Federal False Claims Act to Regulatory Compliance Issues in the Health Care Industry*, 51 Ala. L.Rev. 105, 111–12 (1999)). The distinction between express and implied certification appears to have emerged in circuit case law in a series of decisions at roughly the same time. *See Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531–33 (10th Cir.2000); *United States ex rel. Siewick v. Jamieson*

*Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C.Cir.2000); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786 n. 8 (4th Cir.1999).

At least three circuits have since applied these two distinctions in concert. *See United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113–14 (2d Cir.2010), *rev'd on other grounds*, —— U.S. ——, 131 S.Ct. 1885, 179 L.Ed.2d 825 (2011); *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167–69 (10th Cir.2010); *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 441 (3d Cir.2004).[10] None of these cases addressed the possibility of imposing FCA liability on a defendant who had caused another entity to present a materially false or fraudulent claim for payment to the government.

Courts have created these categories in an effort to clarify how different behaviors can give rise to a false or fraudulent claim. Judicially-created categories sometimes can help carry out a statute's requirements, but they can also create artificial barriers that obscure and distort those requirements. The text of the FCA does not refer to "factually false" or "legally false" claims, nor does it refer to "express certification" or "implied certification." Indeed, it does not refer to "certification" at all. *See United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir.2006) (refusing to give the term "certification" a "paramount and talismanic significance" in part because it does not appear in the text of the FCA). In light of this, and our view that these categories may do more to obscure than clarify the

---

**10.** Drawing on the opinion below, three district court decisions in this circuit have as well. *See United States ex rel. Lisitza v. Johnson & Johnson*, 765 F.Supp.2d 112, 125–26 (D.Mass.2011); *United States ex rel. Rost v.*

*Pfizer, Inc.*, 736 F.Supp.2d 367, 375–76 (D.Mass.2010); *United States ex rel. Westmoreland v. Amgen, Inc.*, 707 F.Supp.2d 123, 133 (D.Mass.2010).

issues before us, we do not employ them here.

## IV.

Two purely legal issues are raised on appeal concerning when implied misrepresentations and third-party actions can give rise to a false or fraudulent claim under the FCA. The district court erroneously adopted a categorical rule with respect to the first of these issues, and appeared to reason within the confines of an erroneous categorical rule with respect to the second.

As to the first issue, the district court held that a claim can only be false or fraudulent for impliedly misrepresenting compliance with a legal condition of payment if that condition is found expressly stated in "the relevant statute or regulations." *Hutcheson,* 694 F.Supp.2d at 63. As to the second, the district court held that because the CMS forms only made representations about the submitting entity and because Hutcheson identified no statute or regulation conditioning Medicare payment on AKS compliance, unlawful actions taken by a third party about which the hospital neither knew nor had reason to know could not render the hospital claims in this case false or fraudulent. *Id.* at 66.

Blackstone defends the categorical rule adopted by the district court in the first holding and advances a categorical rule to defend the second holding. Blackstone argues that (1) a claim can only be false or fraudulent due to an implied legal misrepresentation if it fails to comply with the express requirements of a statute or regulation, and (2) a certification that represents a submitting entity's compliance with certain legal requirements cannot incorporate an implied representation about the conduct of non-submitting entities. We reject both arguments.

### A. *Implied Conditions of Payment*

The district court gave little explanation for its holding that a claim can only be impliedly false or fraudulent for non-compliance with a legal condition of payment if that condition is expressly stated in a statute or regulation. It stated that a claim for payment can be false if submission "implies that [the claim] has complied with any preconditions of payment." *Hutcheson,* 694 F.Supp.2d at 62 (citing *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.,* 543 F.3d 1211, 1218 (10th Cir.2008); *United States ex rel. Augustine v. Century Health Svs., Inc.,* 289 F.3d 409, 415 (6th Cir.2002); *Mikes,* 274 F.3d at 699). It then agreed with the *Mikes* decision that liability under the "implied theory" should be restricted "to compliance with expressly stated preconditions of payment found in the relevant statute or regulations." *Id.* (citing *Mikes,* 274 F.3d at 700). To be clear, the district court held both that implied conditions of payment can only be found in statutes and regulations, and that these sources must expressly state the obligation. We reject both requirements.

Blackstone defends this holding in two ways. First, it argues that this court should follow case law from beyond this circuit that it asserts applied this rule. In particular, Blackstone relies on the Second Circuit's decision in *Mikes,* 274 F.3d 687, the Ninth Circuit's decision in *Ebeid ex rel. United States v. Lungwitz,* 616 F.3d 993 (9th Cir.2010), and the Tenth Circuit's decision in *Conner,* 543 F.3d 1211. Second, Blackstone argues that a rule contrary to the one adopted by the district court would yield broader FCA liability than Congress intended. It argues that such a rule would "encompass all violations of law or regulations" by parties that interact with entities that submit claims for government payment.

Both of these arguments fail. This court is not bound by the case law Blackstone cites, and the text of the FCA does not exhibit an intent to limit liability in this fashion.

Neither party argues that this court or the Supreme Court has expressly spoken to whether a precondition of payment must be explicitly stated in a statute or regulation to give rise to a false or fraudulent claim. Although Hutcheson has invoked the Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), and this court's decision in *Murray & Sorenson v. United States*, 207 F.2d 119 (1st Cir.1953), she has not argued that these cases speak directly to the issue here. These decisions did not distinguish between factual and legal misrepresentations and so had no reason to address the precise source of the government's expectation that the claims at issue in those cases would be unaffected by collusion, *see Hess*, 317 U.S. at 544–45, 63 S.Ct. 379, and inside tips, *see Murray & Sorenson*, 207 F.2d at 123–24.

It is true that the Second Circuit held in *Mikes* that "implied false certification is appropriately applied *only* when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid." *Mikes*, 274 F.3d at 700 (first emphasis added). It is also true that the Ninth Circuit used similar, but not identical, language in *Ebeid*, holding that "[i]mplied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation." *Ebeid*, 616 F.3d at 998; *see also United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir.1996) (stating, in more general terms, that "[m]ere regulatory violations do not give rise to a viable FCA violation").

Other courts, however, have found that a claim may be false or fraudulent due to an implied representation of compliance with a precondition of payment that is not expressly stated in a statute or regulation. The Tenth Circuit's decision in *Conner*, upon which Blackstone mistakenly relies, held that for purposes of "an implied false certification theory, . . . the analysis focuses on the *underlying contracts*, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *Conner*, 543 F.3d at 1218 (emphasis added). The Tenth Circuit has found claims false or fraudulent because a defendant failed to comply with the terms of underlying contractual provisions. *See Shaw*, 213 F.3d at 531–32; *see also Lemmon*, 614 F.3d at 1170 (finding that a defendant's failure to comply with certain regulations whose requirements were incorporated into a government contract rendered a claim false or fraudulent). The D.C. Circuit also recently held that non-compliance with contract terms may give rise to false or fraudulent claims, even if the contract does not specify that compliance with the contract term is a condition of payment. *United States v. Sci. Applications Int'l Corp. (SAIC)*, 626 F.3d 1257, 1269 (D.C.Cir.2010).

**[2]** In *SAIC*, the court rejected the defendant's argument that legal preconditions of payment must be expressly designated as such to give rise to false or fraudulent claims. *Id.* at 1268. It held that "nothing in the statute's language specifically requires such a rule" and that adopting one could "foreclose FCA liability in situations that Congress intended to fall within the Act's scope." *Id.* In response to the defendant's argument that its holding would overextend liability under the FCA, the court stated that this concern does not call for "adopting a circumscribed view of what it means for a claim to be false or

fraudulent," but rather calls for "strict enforcement of the Act's materiality and scienter requirements." *Id.* at 1270. We agree. Like the rule advanced by the defendant in *SAIC*, the rule advanced by Blackstone that only express statements in statutes and regulations can establish preconditions of payment is not set forth in the text of the FCA.

We are not persuaded, moreover, by the concerns that prompted the Second Circuit to adopt such a rule in *Mikes*, nor are we persuaded that the Second Circuit would extend that rule to situations like the one before us.[11] The plaintiffs in *Mikes* alleged that Medicare claims submitted by the defendant health care providers were false or fraudulent because the underlying medical treatment had failed to meet a standard of care. *Mikes*, 274 F.3d at 696. The court reasoned that to find these claims false or fraudulent would allow the government and relators to supplant private plaintiffs in medical malpractice suits. *Id.* at 700. The risk of federalization of what have been private party tort actions is not a foregone conclusion of declining to

adopt a rule that preconditions of payment must be expressly stated in a statute or regulation; nor is that risk sufficient to justify such a rule.

This is so because other means exist to cabin the breadth of the phrase "false or fraudulent" as used in the FCA. The text of the FCA and our case law make clear that liability cannot arise under the FCA unless a defendant acted knowingly and the claim's defect is material.[12] The knowledge requirement is expressly stated in the statute and defined at 31 U.S.C. § 3729(b), and this court has "long held that the FCA is subject to a judicially-imposed requirement that the allegedly false claim or statement be material."[13] *United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 306–07 (1st Cir.2010).

### B. *Non–Submitting Party Conduct*

The district court appeared to employ the concept of certification such that a claim can be false or fraudulent only if the submitting entity knew or should have known of the underlying falsehood or fraudulence. Under the express certification

---

**11.** The Second Circuit has since applied the standard in *Mikes* outside the Medicare context. *See United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 115 (2d Cir. 2010), *rev'd on other grounds*, —— U.S. ——, 131 S.Ct. 1885, 179 L.Ed.2d 825 (2011). In that decision, however, the court held that the submitted claim failed to comply with a precondition of payment expressly stated in a statute. We are unaware of any decision by the Second Circuit finding that a claim was not false or fraudulent where the claim failed to meet a material contract term. *Cf. United States v. Sci. Applications Int'l Corp.* (*SAIC*), 626 F.3d 1257, 1270 (D.C.Cir.2010).

**12.** The parties contest the proper place of this materiality requirement in the analysis under the FCA. Hutcheson argues that a claim can only be legally false or fraudulent if the legal defect is material. Blackstone argues, in keeping with the district court's opinion, that these are two separate inquiries, such that a

claim can be false or fraudulent without being materially so. We decline to resolve this semantic dispute, which has no bearing on the outcome of this case. It is uncontested that only false or fraudulent claims that are materially false or fraudulent can give rise to liability under the FCA.

**13.** In *Loughren*, we noted that the Supreme Court had recently found a materiality requirement applicable to 31 U.S.C. § 3729(a)(2) & (a)(3). *Loughren*, 613 F.3d at 307 (citing *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 128 S.Ct. 2123, 2126, 2130, 170 L.Ed.2d 1030 (2008)). We held that this holding did not disturb "our previous reading of a materiality requirement into the statute more generally," *id.*, and held as well that the FERA amendment to the FCA that incorporated an explicit materiality requirement into the former § 3729(a)(2) did not alter this conclusion, *id.* at 307 n. 8.

theory, the district court held that the certifications in the Provider Agreement and Hospital Cost Report created "no obligation on the part of the signatory to determine whether the entire transaction complied" with the AKS. *Hutcheson*, 694 F.Supp.2d at 66. After holding that the relevant statutes and regulations did not establish AKS compliance as a precondition of Medicare payment, the district court concluded its analysis with the statement that "[t]he Amended Complaint contains no allegations that the hospitals themselves received kickbacks, or that they knew or should have known about the kickbacks received by the doctors." *Id.* at 66.

In its description of the concept of certification, the district court did not explicitly outline such a knowledge requirement for submitting entities. It stated, however, that a claim is legally false "where *a party* certifies compliance [expressly or impliedly] with a statute or regulation as a condition to government payment," but that party "did not actually comply with the statute or regulation." *Id.* at 62 (emphasis added) (citing *Conner*, 543 F.3d at 1217; *Quinn*, 382 F.3d at 440–41; *Siewick*, 214 F.3d at 1375–76; *Harrison*, 176 F.3d at 785–87; *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.1997); *Hopper*, 91 F.3d at 1265–66).

Building on this aspect of the district court's analysis, Blackstone argues that when a submitting entity expressly represents its own legal compliance, its representations cannot encompass a precondition of payment applicable to non-submitting entities. It again advances two arguments. First, it argues that "no court has held that a hospital's truthful certification" can be rendered false "by the acts of an unrelated third party somewhere in the supply chain."

Second, it argues that if unlawful third-party actions could render a claim false or fraudulent on account of a submitting entity's truthful certification, FCA liability would extend to any prohibited behavior "by participants in a marketplace that involves, at some point in a series of transactions, a government program," and thus beyond the scope intended by Congress.

[3] The categorical limitation Blackstone advances does not appear in the text of the statute and is inconsistent with both the statutory text and binding case law. The FCA imposes liability on any person who "knowingly presents, *or causes to be presented*" to the government "a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1) (emphasis added), or "knowingly makes, uses, *or causes to be made or used*, a false record or statement to get a false or fraudulent claim paid or approved by the Government," *id.* 3729(a)(2) (emphasis added). When the defendant in an FCA action is a non-submitting entity, the question is whether that entity knowingly caused the submission of either a false or fraudulent claim or false records or statements to get such a claim paid. The statute makes no distinction between how non-submitting and submitting entities may render the underlying claim or statements false or fraudulent.

To the extent that Blackstone seeks to locate its proposed limitation in the concept of certification, we repeat that the text of the FCA does not employ this concept. Blackstone cites a Ninth Circuit decision for the proposition that "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false *certification* of compliance which creates liability...." *Hopper*, 91 F.3d at 1266. Blackstone omits, however, that decision's qualification that this statement holds "when certification is

a prerequisite to obtaining a government benefit." *Id.* At any rate, as the Ninth Circuit made clear in a later case, "because the word 'certification' does not appear in 31 U.S.C. § 3729(a)(1) or (a)(2), there is no sense in parsing it with the close attention typically attending an exercise in statutory interpretation. So long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach." *Hendow,* 461 F.3d at 1172.

The Supreme Court has long held that a non-submitting entity may be liable under the FCA for knowingly causing a submitting entity to submit a false or fraudulent claim, and it has not conditioned this liability on whether the submitting entity knew or should have known about a non-submitting entity's unlawful conduct. In *Hess,* 317 U.S. 537, 63 S.Ct. 379, the Court held that the language of the FCA "indicate[s] a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud." *Id.* at 544–45, 63 S.Ct. 379. The Court has since reaffirmed this aspect of *Hess.* More than thirty years later, in *United States v. Bornstein,* 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), it held a subcontractor liable under the FCA for causing a contractor to submit claims seeking payment for materials that, apparently unbeknownst to the contractor, were labeled incorrectly. *Id.* at 309–313, 96 S.Ct. 523.

This court has followed suit. In *Murray & Sorenson,* 207 F.2d 119, we held that the defendant had caused the submission of false or fraudulent claims because the government contract bids it relayed to a sub-

mitting entity had been secretly inflated in response to tips about the government's willingness to pay. *Id.* at 123–24. We have made clear that unlawful acts by non-submitting entities may give rise to a false or fraudulent claim even if the claim is submitted by an innocent party. *See Rivera,* 55 F.3d at 710–12 (stating that a "false claim may be presented through an innocent third party" (citing *Bornstein,* 423 U.S. at 309, 96 S.Ct. 523)); *see also Scolnick v. United States,* 331 F.2d 598 (1st Cir.1964) (holding a party liable under the FCA when it submitted a mistakenly issued government check to a bank and the bank submitted the check to the government).

These cases do not hold that a submitting entity's representations concerning its own conduct somehow immunize a non-submitting entity from liability under the "causes" clauses of the FCA. Nor does Blackstone cite any other decision from the Supreme court or this court that says that.

Blackstone attempts to distinguish the cases Hutcheson cites concerning third-party liability under the FCA as inapposite because they dealt with "factually false" rather than "legally false" claims. The decisions do not speak in terms of these newly created categories, which are not in the text of the FCA. Nor would Blackstone's effort to retroactively categorize these cases work even if we accepted its terms, which we do not.

While *Bornstein, Rivera,* and *Scolnick* arguably involve misrepresentations of a strictly factual nature,[14] *Hess* and *Murray & Sorenson* involve misrepresentations related to a legal status. As we held in *Murray & Sorenson,* "in *Hess* there was

---

**14.** This proposition is more contestable with respect to *Scolnick* than *Bornstein* and *Rivera.* The claim for payment at issue in *Scolnick* did not misrepresent a fact about the mistakenly

issued government check. Rather, the claim implicitly represented that the check was valid and thus met the legal conditions of payment.

an implied false representation that the bids were competitive, and in this case there was an implied false representation that the bids were at a figure which the corporate defendant would have submitted in competition instead of at a somewhat higher figure" due to the tip. *Murray & Sorenson*, 207 F.2d at 124. These claims did not misstate a fact; they implied that the defendants had not engaged in certain illicit behaviors that would disqualify them from payment. Neither decision identified a statute, regulation, or certification as the basis of the legal precondition of payment the respective defendants had failed to meet.[15]

None of the cases relied on by Blackstone and the district court, moreover, address when the actions of a non-submitting entity can give rise to a false or fraudulent claim. Each of these cases concerned whether claims submitted by the defendant, rather than claims a defendant caused a third party to submit, were false or fraudulent under the FCA. *See, e.g., Conner*, 543 F.3d 1211 (claim submitted by defendant hospital); *Quinn*, 382 F.3d 432 (claim submitted by defendant pharmacies); *Siewick*, 214 F.3d 1372 (claim submitted by defendant corporation); *Thompson*, 125 F.3d 899 (claim submitted by defendant health care provider); *Hopper*, 91 F.3d 1261 (claim submitted by defendant school district). We cannot adopt Blackstone's categorical rule, which is at odds with the holdings of controlling decisions of both this court and the Supreme Court.

Blackstone cannot evade this conclusion by arguing that in the absence of the rule it proposes FCA liability will stretch too broadly to non-submitting entities.[16] First, we cannot rewrite statutes. Second, the policy concerns are overblown. Only persons who knowingly submit or cause the submission of a false or fraudulent claim can be held liable for violating the FCA. The term "causes" is hardly boundless; it has been richly developed as a constraint in various areas of the law. *See, e.g.,* W. Page Keeton et al., *Prosser and Keeton on Torts* § 41–44 (5th ed.1984)

---

**15.** At oral argument, Blackstone introduced an additional argument that the claims in *Hess* and *Murray & Sorenson* were false because the submitting entity had "passed along" a false certification by the defendants, who had not submitted claims themselves. However, neither decision gave this rationale for finding the claims at issue false or fraudulent. Nor is it clear that this description fits the facts in either case; neither decision speaks in detail of the materials the defendants gave to the submitting entities.

**16.** At oral argument, Blackstone raised a related argument that if claims that contain legal misrepresentations unbeknownst to the submitting entity could be false or fraudulent, submitting hospitals would be required to return these payments as "overpayments" under a provision of the new Patient Protection and Affordable Care Act (PPACA), Pub.L. No. 111–148, 124 Stat. 119 (2010). *See* 42 U.S.C. § 1320a–7k(d).

Blackstone and the United States dispute the extent to which enforcement of this requirement would be subject to the government's discretion. The United States contends that it may choose to pursue the architects of a kickback scheme rather than penalize innocent submitting hospitals. Blackstone argues that regardless of such a decision by the government, private relators can sue innocent submitting hospitals under the PPACA. *See id.* § 1320–7k(d)(3) (citing 31 U.S.C. § 3729(b)(3)).

This dispute is tangential to the question at hand, and we do not discuss it further. As Blackstone acknowledges, the Supreme Court has held that claims may be false or fraudulent even when the submitting entity was unaware of the underlying falsehood or fraudulence. This argument amounts to the assertion that these holdings only apply to so-called factually false claims and not to so-called legally false claims. As we have noted, the text of the FCA and the relevant case law makes no such distinction.

(discussing causation in tort law). And contrary to Blackstone's argument, as the Supreme Court has held, in enacting the FCA "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Cook Cnty., Illinois v. United States ex rel. Chandler*, 538 U.S. 119, 129, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) (quoting *United States v. Neifert–White Co.*, 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968)).

## V.

Having rejected Blackstone's efforts to narrow the text of the statute and thereby justify dismissal of the case, we turn to the question of whether Hutcheson's complaint identified a materially false or fraudulent claim. Hutcheson and Blackstone disagree as to whether the language and legislative history of the AKS, as well as a recent amendment to the statute in the Patient Protection and Affordable Care Act (PPACA), Pub.L. No. 111–148, 124 Stat. 119 (2010), establish that AKS compliance is, without more, a precondition of Medicare payment.[17] We need not address this dispute, as we hold that the Provider Agreement and Hospital Cost Report forms identified in Hutcheson's complaint are sufficient to support her claim.

As we explain below, the claims presented to the government in this case, as alleged, represented that there had been compliance with a material precondition of payment that had not been met. We do not categorize this representation as one of law or fact, nor do we categorize it as either express or implied. We also do not address whether this representation constituted a "certification" within the meaning of case law from beyond this circuit. These formal categories, as we have discussed, are nowhere mentioned in the statute. We first address whether the claims at issue here misrepresented compliance with a precondition of payment so as to be false or fraudulent and then address whether those misrepresentations were material.

### A. *Misrepresentation*

[4] Hutcheson argues that the Provider Agreement and Hospital Cost Report forms make clear that compliance with the AKS is a precondition of Medicare payment. In addition to raising the categorical arguments rejected above, Blackstone argues that the Provider Agreement and Hospital Cost Report forms did not identify this precondition with sufficient specificity to render the claims at issue in this case false or fraudulent. As to the hospital claims, Blackstone argues that these forms did not create an express or implied representation that anyone other than the submitting hospital had complied with the AKS. As to the physician claims, Blackstone argues that while the Provider Agreement represented physician compliance with the AKS, this representation only extended to claims that would not have been made in the absence of kickbacks.

The Provider Agreement, drafted by CMS, requires that hospitals and physicians acknowledge that they "understand that payment of a claim by Medicare is conditioned upon the claim and the *underlying transaction* complying with [Medicare's] laws, regulations and programs instruction." (Emphasis added.) The Agreement specifically identifies "the Fed-

---

**17.** The amendment in question states that a "claim that includes items or services resulting from a violation of" the AKS "constitutes a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. § 1320a–7b(g).

eral anti-kickback statute" as one of only two enumerated examples of the relevant "laws, regulations, and program instructions." This language makes clear that the federal Medicare program will not pay claims if the underlying transaction that gave rise to the claim violated the AKS. The Agreement makes no exception for instances in which that "underlying transaction" violated the AKS because of the actions of a third party like Blackstone.

The Hospital Cost Report, also drafted by CMS, further underscores that hospitals submitting claims represent compliance with the AKS. The form states that "if services identified in this report [were] provided or procured through the payment directly or indirectly of a kickback ... fines and/or imprisonment may result." It also requires that the hospital's representative sign a statement certifying that he or she is "familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." [18] This makes it abundantly clear that AKS compliance is a precondition of Medicare payment and makes no exceptions for violations caused by third parties like Blackstone.

These two documents are more than specific enough to make clear that the claims submitted by *hospitals* represented that any underlying transactions had not involved third party kickbacks prohibited by the AKS. Blackstone advances a formalistic reading of the documents to avoid the conclusion that these forms recognize this precondition of Medicare payment. It also seeks to divert attention from this clear language by focusing on whether the hospitals knew of the underlying kickbacks, a fact that has no bearing on Blackstone's potential liability under the FCA. The reading Blackstone proposes would not only strain the language of the documents; it would systematically excuse from FCA liability non-submitting entities who cause the submission of claims that fail to meet that stated precondition.

The Provider Agreement is also sufficiently clear to establish that the claims submitted by *physicians* represented that the underlying transactions did not involve kickbacks to physicians prohibited by the AKS. The physicians agreed that payment from Medicare is conditioned on compliance with the AKS, yet allegedly accepted kickbacks in violation of the AKS. Blackstone argues that the physician claims nonetheless were not false or fraudulent because the claims were for services that would have been provided in the absence of the alleged AKS violations. This argument does not address the complaint's allegation that under the express terms of the Agreement, the "underlying transaction" violated the AKS and therefore that the resulting claims were ineligible for payment.[19] Instead, it addresses whether these claims were *materially* false or fraudulent, which we address separately.

These allegations of misrepresentation, we hold, are sufficient to state a claim that the hospital and physician claims for payment at issue here were false or fraudu-

---

**18.** Blackstone focuses on the first sentence of this certification, which is qualified by the phrase, "[t]o the best of my knowledge." The second statement, however, is accompanied by no such qualification.

**19.** Blackstone argues that "a hospital's purchase of a device used in an inpatient surgical procedure is not a transaction that underlies

or is a part of the physician's request for payment for physician services." This argument, however, does not address whether a physician's receipt of kickbacks is a transaction underlying that physician's provision of services associated with the products involved in the kickback scheme.

lent. This holding is consistent with those of other courts that have found claims false or fraudulent for non-compliance with a contract term. *See SAIC,* 626 F.3d at 1269; *Shaw,* 213 F.3d at 531–32; *see also Lemmon,* 614 F.3d at 1170. To be clear, we are not creating a rule that non-compliance with a contractual condition is any more necessary to establish that a claim is false or fraudulent than non-compliance with an express statute or regulation, or an express misrepresentation on a form submitted with payment. We now turn to the question of whether the claims in this case failed to comply with a material condition of payment for purposes of the FCA.

## B. *Materiality*

Blackstone makes two arguments that the hospital and physician misrepresentations were not material. As to the hospital claims, Blackstone argues that a payment mechanism rendered any AKS non-compliance irrelevant to the payment of claims. Hospitals, it argues, classify patients within "diagnosis-related groups" (DRGs) and receive a set payment for treating patients in a group regardless of the particular services provided.[20] As to the physician claims, Blackstone reiterates the argument it advanced that these claims did not misrepresent AKS compliance. It argues that the physicians submitted claims for their services conducting medically necessary surgeries, not for the devices allegedly used because of Blackstone's kickbacks.

[5] In *Loughren,* this court held that a false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Loughren,* 613 F.3d at 307 (alteration in original) (quoting *Neder v. United States,* 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)) (internal quotation marks omitted). Although *Loughren* was decided after the district court's decision, this standard is not relevantly different from the one the district court employed. *See Hutcheson,* 694 F.Supp.2d at 64. Express contractual language may "constitute dispositive evidence of materiality," but materiality may be established in other ways, "such as through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue." *SAIC,* 626 F.3d at 1269.

We cannot say that, as a matter of law, the alleged misrepresentations in the hospital and physician claims were not capable of influencing Medicare's decision to pay the claims. *See Ocasio–Hernández v. Fortuño–Burset,* 640 F.3d 1, 16–17 (1st Cir. 2011) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The intricacies of the DRG system do not alter the clear language of the Provider Agreement and the Hospital Cost Report forms. Nor does the fact that the physician claims sought payment for services rather than devices somehow render the fact that the physicians accepted kickbacks irrelevant under the language of the Provider Agreement.

If kickbacks affected the transaction underlying a claim, as Hutcheson alleges, the claim failed to meet a condition of payment. Blackstone's argument that Medicare would excuse these violations because

---

**20.** Blackstone has not expressly cast this argument as one concerned with materiality. Rather, it has argued that a claim related to a "diagnosis-related group" cannot be false or fraudulent because the claim does not address the particular services used in the treatment of a patient. To the extent this argument concerns whether a sufficiently specific misrepresentation occurred, we reject it for the same reasons we rejected Blackstone's other arguments concerning the specificity of hospital misrepresentations.

of a bureaucratic mechanism or because of an implicit medical necessity requirement impermissibly cabins what the government may consider material. Neither the Provider Agreement nor the Hospital Cost Report forms speak of such exceptions recognized by Medicare. We find Hutcheson's allegations sufficient to show, for purposes of this motion to dismiss, that the kickbacks were capable of influencing Medicare's decision as to whether to pay the hospital and physician claims.

### VI.

For the foregoing reasons, we *reverse* the district court's dismissal of Hutcheson's complaint under Rule 12(b)(6) for failing to identify a materially false or fraudulent claim within the meaning of the FCA, and we *remand* for further proceedings consistent with this opinion.

*So ordered.*



**UNITED STATES of America,
Appellee,**

**v.**

**Jesús L. RODRÍGUEZ–MORALES
a/k/a Daniel, Defendant,
Appellant.**

**No. 10–1021.**

United States Court of Appeals,
First Circuit.

Heard March 8, 2011.

Decided July 26, 2011.

**Background:** The United States District Court for the District of Puerto Rico, Francisco A. Besosa, J., denied defendant's motions to withdraw his guilty plea, and convicted him of aggravated identity theft. Defendant appealed.

**Holding:** The Court of Appeals, Torruella, Circuit Judge, held that prosecutor's misestimation of defendant's probable guidelines range did not render defendant's guilty plea involuntary.

Affirmed.

**1. Criminal Law ⚖1149**

District court's decision to deny motion to withdraw guilty plea is reviewed for abuse of discretion. Fed.Rules Cr.Proc. Rule 11, 18 U.S.C.A.

**2. Criminal Law ⚖1134.27, 1139**

Abstract questions of law are reviewed de novo, findings of raw fact are tested for clear error, and law application and balancing judgments are usually reviewed for reasonableness.

**3. Criminal Law ⚖274(3.1, 8, 9)**

Relevant factors in considering whether defendant has presented just and fair reason to withdraw guilty plea are whether plea was voluntary, intelligent, knowing and complied with Rule 11; force of reasons offered by defendant; whether there is serious claim of actual innocence; motion's timing; and any countervailing prejudice to government if defendant is allowed to withdraw his plea.

**4. Criminal Law ⚖1026.10(2.1)**

Waiver-of-appeal provision in plea bargain is valid if: (1) written plea agreement clearly delineates waiver's scope; (2) district court inquired specifically at plea hearing about any waiver of appellate rights; and (3) denial of right to appeal would not constitute miscarriage of justice. Fed.Rules Cr.Proc.Rule 11, 18 U.S.C.A.

**Westlaw Delivery Summary Report for SCARBOROUGH,CHAR**

Date/Time of Request:                      Tuesday, January 3, 2012 15:48 Central
Client Identifier:                         DOJ
Database:                                  FEDFIND
Citation Text:                             659 F.3d 295
Lines:                                     1272
Documents:                                 1
Images:                                    0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



United States Court of Appeals,
Third Circuit.
UNITED STATES ex rel. Charles WILKINS; Daryl
Willis, Appellants
v.
UNITED HEALTH GROUP, INCORPORATED;
AmeriChoice; AmeriChoice of New Jersey, Inc.

No. 10–2747.
Argued March 24, 2011.
Filed: June 30, 2011.

**Background:** Qui tam relators brought False
Claims Act (FCA) action on behalf of United States
against healthcare services company and subsidiar-
ies, stemming from purported violations of Medi-
care Act. The United States District Court for the
District of New Jersey, Robert B. Kugler, J., 2010
WL 1931134, dismissed action. Relators appealed.

**Holdings:** The Court of Appeals, Greenberg, Cir-
cuit Judge, held that:
(1) implied false certification theory of FCA liabil-
ity was viable;
(2) relators failed to allege violations of Medicare
marketing regulations; and
(3) relators alleged violations of Medicare anti-
kickback provisions.

Affirmed in part and reversed and remanded in
part.

West Headnotes

**[1] United States 393 ⟲122**

393 United States
393VIII Claims Against United States
393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
393k122 k. Penalties and actions therefor.
Most Cited Cases
Under False Claims Act (FCA), private indi-

viduals can bring qui tam actions on behalf of gov-
ernment in exchange for their right to retain some
portion of any resulting damages award. 31
U.S.C.A. § 3729 et seq.

**[2] Federal Courts 170B ⟲752**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk752 k. Matters or evidence con-
sidered. Most Cited Cases
Documents that parties did not present to the
district court and that district court did not consider
on appeal on its own initiative would not be con-
sidered on appeal, absent exceptional circum-
stances. F.R.A.P.Rule 10(a), 28 U.S.C.A.

**[3] Federal Courts 170B ⟲752**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk752 k. Matters or evidence con-
sidered. Most Cited Cases
Although a court of appeals may take judicial
notice of matter of public record not presented to
district court when reviewing disposition of motion
to dismiss, court of appeals ordinarily should not
take judicial notice of documents on appeal which
were available before district court decided case but
nevertheless were not tendered to that court.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[4] United States 393 ⟲122**

393 United States
393VIII Claims Against United States
393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
393k122 k. Penalties and actions therefor.
Most Cited Cases
Primary purpose of the False Claims Act

(FCA) is to indemnify the government, through its restitutionary penalty provisions, against losses caused by a defendant's fraud. 31 U.S.C.A. § 3729 et seq.

**[5] United States 393 ⬤⬤120.1**

393 United States
  393VIII Claims Against United States
    393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
      393k120.1 k. In general. Most Cited Cases

To establish prima facie violation of False Claims Act (FCA), plaintiff must prove that: (1) defendant presented or caused to be presented to agent of United States claim for payment; (2) claim was false or fraudulent; and (3) defendant knew claim was false or fraudulent. 31 U.S.C.App.(2006 Ed.) § 3729(a)(1).

**[6] United States 393 ⬤⬤120.1**

393 United States
  393VIII Claims Against United States
    393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
      393k120.1 k. In general. Most Cited Cases

Claim is "factually false" under False Claims Act (FCA) when claimant misrepresents goods or services that it allegedly provided to government. 31 U.S.C.A. § 3729 et seq.

**[7] United States 393 ⬤⬤120.1**

393 United States
  393VIII Claims Against United States
    393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
      393k120.1 k. In general. Most Cited Cases

Claim is "legally false" under False Claims Act (FCA) when claimant knowingly and falsely certifies that it has complied with statute or regulation, compliance with which is condition for government

payment. 31 U.S.C.A. § 3729 et seq.

**[8] United States 393 ⬤⬤120.1**

393 United States
  393VIII Claims Against United States
    393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
      393k120.1 k. In general. Most Cited Cases

Under "express false certification" theory of liability under False Claims Act (FCA), entity is liable for falsely certifying that it is in compliance with regulations which are prerequisites to government payment in connection with claim for payment of federal funds. 31 U.S.C.A. § 3729 et seq.

**[9] United States 393 ⬤⬤120.1**

393 United States
  393VIII Claims Against United States
    393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
      393k120.1 k. In general. Most Cited Cases

"Implied false certification" theory of liability under False Claims Act (FCA) attaches when claimant seeks and makes claim for payment from government without disclosing that it violated regulations that affected its eligibility for payment. 31 U.S.C.A. § 3729 et seq.

**[10] United States 393 ⬤⬤120.1**

393 United States
  393VIII Claims Against United States
    393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
      393k120.1 k. In general. Most Cited Cases

A plaintiff may bring a False Claims Act (FCA) suit under an implied false certification theory of liability. 31 U.S.C.A. § 3729 et seq.

**[11] United States 393 ⬤⬤120.1**

393 United States

393VIII Claims Against United States
393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
393k120.1 k. In general. Most Cited Cases

The implied certification theory of liability under False Claims Act (FCA) should not be applied expansively, particularly when advanced on the basis of FCA allegations arising from the Government's payment of claims under federally funded health care programs. 31 U.S.C.A. § 3729 et seq.

**[12] United States 393 ☞120.1**

393 United States
393VIII Claims Against United States
393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
393k120.1 k. In general. Most Cited Cases

Pursuant to implied false certification theory of liability under False Claims Act (FCA), plaintiff must show that, if government had been aware of defendant's violations of Medicare laws and regulations that are bases of plaintiff's FCA claims, it would not have paid defendant's claims. 31 U.S.C.A. § 3729 et seq.; Social Security Act, § 1801 et seq., 42 U.S.C.A. § 1395 et seq.

**[13] United States 393 ☞122**

393 United States
393VIII Claims Against United States
393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
393k122 k. Penalties and actions therefor. Most Cited Cases

Qui tam relators that sued healthcare services company and subsidiaries, alleging violations of Medicare marketing regulations, failed to allege that government would not have paid defendants' Medicare claims had it been aware of their purported violations, as required to state claim under False Claims Act (FCA), since government's payments of claims were not conditioned on defendants' compliance with marketing regulations. 31

U.S.C.App.(2006 Ed.) § 3729(a)(1); Social Security Act, § 1801 et seq., 42 U.S.C.A. § 1395 et seq.; 42 C.F.R. §§ 422.509, 422.510.

**[14] Health 198H ☞535(1)**

198H Health
198HIII Government Assistance
198HIII(C) Federal Medical Assistance to the Elderly (Medicare)
198Hk532 Providers
198Hk535 Reimbursement
198Hk535(1) k. In general. Most Cited Cases

Although federal government considers substantial compliance with Medicare marketing regulations to be condition of ongoing Medicare participation, it does not require perfect compliance as absolute condition for receiving Medicare payments for services rendered. Social Security Act, § 1801 et seq., 42 U.S.C.A. § 1395 et seq.; 42 C.F.R. §§ 422.509, 422.510.

**[15] United States 393 ☞122**

393 United States
393VIII Claims Against United States
393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
393k122 k. Penalties and actions therefor. Most Cited Cases

Qui tam relators that sued healthcare services company and subsidiaries alleged that defendants submitted Medicare claims for payment at time that they knowingly violated law, rule, or regulation that was condition for receiving such payment, as required to state claim under False Claims Act (FCA) under an implied false certification theory; complaint averred that defendants knowingly violated Medicare anti-kickback provisions while submitting claims for payment under federal health insurance program. 31 U.S.C.A. § 3729 et seq.; Social Security Act, § 1128B(b)(2), 42 U.S.C.A. § 1320a–7b(b)(2); 42 C.F.R. § 413.24(f)(4)(iv).

**[16] United States 393 ☞120.1**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
            393k120.1 k. In general. Most Cited Cases

Under "implied false certification" theory of False Claims Act (FCA) liability, instead of looking at defendant's representations to government, analysis focuses on underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance prerequisite to government's payment. 31 U.S.C.A. § 3729 et seq.

**[17] Health 198H ⬦535(1)**

198H Health
    198HIII Government Assistance
        198HIII(C) Federal Medical Assistance to the Elderly (Medicare)
        198Hk532 Providers
            198Hk535 Reimbursement
                198Hk535(1) k. In general. Most Cited Cases

Compliance with the Medicare Anti–Kickback Statute (AKS) is a condition of payment under Parts C and D of Medicare. Social Security Act, § 1128B, 42 U.S.C.A. § 1320a–7b; 42 C.F.R. §§ 422.504(h), 423.505(h).

**[18] Federal Civil Procedure 170A ⬦849**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak849 k. Proceedings for allowance. Most Cited Cases

When district court allows plaintiffs opportunity to amend complaint so that they can survive motion to dismiss for failure to state claim, it is implicit in court's ruling that, if plaintiffs seek to amend complaint, they will do so only in good faith and allege facts that they believe they can prove. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[19] Federal Civil Procedure 170A ⬦1838**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
        170AXI(B)5 Proceedings
            170Ak1837 Effect
                170Ak1838 k. Pleading over. Most Cited Cases

Plaintiffs' request in their reply to defendants' motion to dismiss that they be permitted to amend their complaint in event that motion was granted, without an attached amended complaint, was not the proper method to seek to amend their complaint. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**\*298** Ross Begelman, Esq. (argued), Marc M. Orlow, Esq., Begelman, Orlow & Melletz, Cherry Hill, NJ, for appellants.

Michael C. Theis, Esq. (argued), Jaasi J. Munanka, Esq., Hogan Lovells US, Denver, CO, William P. Deni, Jr., Esq., Bruce A. Levy, Esq., Ellen Lubensky, Esq., Gibbons, Newark, NJ, for appellees.

Tony West, Esq., Assistant Attorney General, Paul J. Fishman, Esq., United States Attorney, Douglas N. Letter, Esq., Teal Luthy Miller, Esq. (argued), Attorneys, Appellate Staff, Civil Division, U.S. Department of Justice, Washington, DC, for amicus curiae United States.

BEFORE: FUENTES, SMITH, and GREENBERG, Circuit Judges.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

[1] This matter comes on before this Court on an appeal from an order of the District Court entered on May 13, 2010, granting the motion of appellees United Health Group, AmeriChoice, and AmeriChoice–New Jersey (collectively "appellees") under Federal Rule of Civil Procedure 12(b)(6) to dismiss Charles Wilkins' and Daryl Willis' (collectively "appellants") *qui tam* action[FN1] based on the False Claims Act ("FCA"), 31 U.S.C.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

§ 3729, for failure to state a claim on which relief may be granted. Appellants have alleged that appellees, through their participation in federally funded health insurance programs, certified that they were in compliance with all healthcare laws and regulations even though they knowingly violated several Medicare marketing regulations, resulting in their submission of false claims for payment to the federal government. Appellants further alleged that AmeriChoice–NJ violated the FCA by illegally providing kickbacks in violation of the Medicare Anti–Kickback Statute ("AKS"), 42 U.S.C. § 1320a–7b, to a New Jersey medical clinic to induce the clinic to switch its patients to AmeriChoice–NJ's Medicare and Medicaid programs. Moreover, appellants have alleged that AmeriChoice–NJ agents violated the AKS by enticing doctors to provide the names of patients eligible for Medicare and Medicaid programs. Thus, this action involves two distinct types of claims with which we will deal separately.

> FN1. Private individuals can bring *qui tam* actions on behalf of the Government in exchange for their right to retain some portion of any resulting damages award. *See Schindler Elevator Corp. v. U.S. ex rel. Kirk,* —— U.S. ——, 131 S.Ct. 1885, 1889, 179 L.Ed.2d 825 (2011); *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 769–70, 120 S.Ct. 1858, 1860–61, 146 L.Ed.2d 836 (2000).

In addition to involving two distinct types of claims, the action implicates the two medical programs to which we already have referred, Medicare, a federally subsidized health insurance program for the elderly and certain disabled persons, *see* 42 U.S.C. § 1395c and d, and Medicaid, a cooperative federal-state public assistance program pursuant to which the federal government makes matching funds available to pay for certain medical services **\*299** furnished to needy individuals, *see* 42 U.S.C. § 1396. Some elderly poor are "dual eligible" under both programs.[FN2] Though appellants mention

both programs in their complaint, this case is essentially a Medicare case arising, as the District Court indicated at the outset of its opinion, "out of alleged fraudulent claims to Medicare." *United States ex rel. Wilkins v. United Health Group, Inc.,* Civ. No. 08–3425, 2010 WL 1931134, at \*1, 2010 U.S. Dist. LEXIS 47080, at \*1 (D.N.J. May 13, 2010) (" *Wilkins* ").

> FN2. Appellants state in their brief that dual eligible individuals receive their prescription drug coverage from Medicaid, but amicus curiae United States seems to describe Medicaid's responsibility more broadly with respect to dual eligible individuals. We are not concerned, however, with the division between Medicare and Medicaid of responsibility for benefits for dual eligible individuals on this appeal and thus will not address that point.

The District Court held that appellants' allegations failed to state a plausible claim for relief under the FCA for two reasons: (1) appellants failed to identify a single false claim that appellees submitted to the Government, and (2) the marketing regulations that appellants claimed appellees violated were not relevant to the Government's decision to pay appellees' Medicare claims. In addition, the Court dismissed appellants' AKS claims because they did not include an allegation that appellees certified that they were in compliance with the AKS or that such compliance was a relevant consideration when the Government processed their Medicare claims. Inasmuch as we agree with the Court's disposition of appellants' Medicare marketing regulations claims but disagree with its holding with respect to appellants' AKS claims, we partially will affirm and partially will reverse the Court's May 13, 2010 order and we will remand the case to the District Court for further proceedings.

## II. FACTS AND PROCEDURAL HISTORY

In view of the procedural posture of this case, we set forth the facts as appellants have alleged them, and decide the appeal on the basis of those

allegations and, in doing so, will construe the complaint in the light most favorable to appellants. *See Lexington Nat. Ins. Corp. v. Ranger Ins. Co.,* 326 F.3d 416, 417 (3d Cir.2003).

United Health provides access to health care services and resources and AmeriChoice and AmeriChoice–NJ are United Health subsidiaries offering Medicare Advantage ("MA") plans.[FN3] Under MA plans, AmeriChoice and AmeriChoice–NJ provide individuals enrolled in Medicare with health care services and submit claims to the Government for reimbursement based on the number of patients enrolled in their Medicare programs.[FN4] Organizations which provide services under Medicare do so pursuant to contracts with the Centers for Medicare and Medicaid Services ("CMS"), **\*300** a division of the Department of Health and Human Services charged with administering the Medicare and Medicaid programs. *See* 42 C.F.R. § 422.503(a). Each month, as participants offering MA plans, appellees certify to CMS that they continue to comply with all of the CMS MA guidelines including MA marketing regulations and the AKS.

> FN3. Medicare Advantage, otherwise known as Medicare "Part C," authorizes qualified individuals to opt out of traditional fee-for-service coverage under Medicare Parts A and B and enroll in privately-run managed care plans that provide coverage for both inpatient and outpatient services. 42 U.S.C. §§ 1395w–21, 1395w–28. United Health also offers qualified individuals coverage under Medicare Part D which is a voluntary prescription drug benefit program. *See* 42 U.S.C. § 1395w–101 *et seq.*

> FN4. The Government pays MA plan participants a set amount of money based on the plans' enrollees' risk factors and other characteristics rather than paying them a fee for specific services performed. *See* 42 C.F.R. §§ 422.300 *et seq.* CMS makes advance monthly payments to participants

calculated on the number of enrollees, adjusted to reflect risk and variations in rates within the plan's service area. *See* 42 C.F.R. §§ 422.304, 423.315.

Wilkins and Willis began employment with United Health Group and AmeriChoice in 2007, Willis as a general manager for Medicare/Medicaid marketing and sales and Wilkins as a sales representative. In April 2008, United Health terminated Wilkins' employment in reaction to his complaints concerning what he perceived were United Health's illegal practices which are the basis for this action. Similarly, at some point during 2008, United Health, after demoting Willis for his conduct in making complaints to his supervisors about what he perceived were United Health's illegal practices, went further and terminated his employment.

On July 10, 2008, appellants filed this *qui tam* action under seal in the District Court alleging that appellees' sales representatives violated the FCA by offering physicians illegal kickbacks and violating MA marketing rules while accepting payments from government funded health insurance programs. Specifically, appellants alleged that: (1) United Health used marketing flyers that CMS did not approve beforehand; (2) its licensed sales agents engaged in marketing activities in the waiting rooms of clinics and doctors' offices; (3) non-licensed individuals engaged in marketing activities; (4) United Health commonly used an excessive number of sales representatives at presentations in an attempt to "overwhelm the public;" (5) sales representatives asked persons to raise their hands at presentations if they were eligible for both Medicare and Medicaid; (6) marketing personnel chased people in supermarkets to ask them whether they were dual eligible; (7) United Health used brokers to engage in door-to-door solicitation; (8) United Health sales agents gave out prizes at Medicare presentations in excess of $15 in value contrary to CMS guidelines; (9) AmeriChoice's sales representatives paid $27,000 to a medical clinic, Reliance Medical Group, to switch certain eligible benefi-

ciaries to its Medicare and Medicaid plans; (10) United Health's sales representatives offered payments to physicians in exchange for the physicians providing appellees with the names of potential new enrollees eligible for Medicare and Medicaid; (11) United Health failed to maintain and implement a compliance program.[FN5] App. at 39–46.

> FN5. Even though this last claim appears to be separate from appellants' claims based on marketing violations and illegal kickback payments, appellants do not make any separate arguments based on appellees' failure to maintain a compliance program.

After appellants filed this action the Government investigated their claims, and, during the investigation, in accordance with the FCA's requirements the case remained under seal. On May 26, 2009, after the Government finished its investigation, it notified the parties that it would not intervene in the case. *See* 31 U.S.C. § 3730(b)(4)(B).[FN6] On August 5, 2009, appellants filed an amended complaint which pleaded an FCA claim predicated on the allegations we discuss above and nine claims based on violations of state law.[FN7] **\*301** Notwithstanding the seeming specificity of appellants' complaint, they do not identify any specific claim for payment that United Health made to the federal Government in violation of the FCA. The complaint, however, does allege that CMS makes advanced monthly payments to United Health for each enrollee in its plans and that United Health certifies each month its "continued compliance with all of the CMS [Medicare Advantage] Guidelines and based on such certification, United Defendants continues [sic] to receive the monthly capitation payment." Am. Compl. at 10. [FN8] Thus appellants contend that appellees, by submitting claims for payment to CMS while failing to comply with the Medicare laws and regulations, including the AKS, presented false claims to the Government in violation of the FCA.

> FN6. The Government did not move to dis-

miss the action, as it could have done under 31 U.S.C. § 3730(c)(2)(A).

> FN7. The state law claims alleged that appellees' actions violated state false claims act provisions of New Jersey, Florida, Indiana, Michigan, Tennessee, Texas, and New York law. In addition, Wilkins and Willis individually alleged that appellees violated the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19–1 *et seq.* (West 2000). These state law allegations are not at issue in this appeal.

> FN8. The parties have included the original complaint but not the amended complaint in their joint appendix. We, however, have examined both versions of the complaint, and have considered both in our disposition of this appeal.

After the Government declined to intervene, appellees moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted and Federal Rule of Civil Procedure 9(b) for failure to plead fraud with particularity.[FN9] The District Court granted appellees' motion for failure to state a claim and therefore did not address appellees' alternative argument for dismissal that appellants failed to plead their claims with the particularity that Rule 9(b) requires. The Court dismissed the complaint because appellants did not identify "even a single claim for payment to the Government." *Wilkins,* 2010 WL 1931134, at \*4, 2010 U.S. Dist. LEXIS 47080, at \*13. Moreover, the Court held that United Health's failure to comply with marketing guidelines and regulations that were not relevant to the Government's decision to issue payment could not be the basis for a recovery for an FCA violation. The Court also rejected appellants' FCA claims that they based on violations of the AKS, finding that appellants failed to allege that United Health certified compliance with the AKS and also failed to allege that the Government predicated its

659 F.3d 295
**(Cite as: 659 F.3d 295)**

funding decisions on such a certification. Finally, the Court declined to exercise supplemental jurisdiction over appellants' state law claims and denied appellants' request for leave to amend the complaint.

> FN9. We have held that plaintiffs must plead FCA claims with particularity in accordance with Rule 9(b). *See U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs.,* 149 F.3d 227, 234 (3d Cir.1998).

Appellants filed a timely notice of appeal from the District Court's May 13, 2010 order, challenging the Court's decision granting appellees' motion to dismiss and arguing that, in any event, when the Court determined that it would dismiss the complaint it should have done so without prejudice and/or allowed appellants to amend their complaint. The Government, though declining to intervene in the District Court and expressing no opinion on the merits of appellants' claims, has filed an amicus curiae brief urging us to reverse the District Court's order to the extent that the Court concluded that an FCA claim cannot survive if the plaintiff does not identify a specific false claim that a defendant submitted for payment and that appellants' kickback allegations did not state a claim for relief under the FCA.

**\*302** III. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over appellants' FCA claims under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 and supplemental jurisdiction over appellants' state law claims under 28 U.S.C. § 1367. We have jurisdiction to review the District Court's final order under 28 U.S.C. § 1291.

We exercise plenary review of the District Court's order granting appellees' motion to dismiss for failure to state a claim. *See Allen ex rel. Martin v. LaSalle Bank, N.A.,* 629 F.3d 364, 367 (3d Cir.2011). As we have indicated, we accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to appel-

lants, and determine whether, under any reasonable reading of the amended complaint, appellants may be entitled to relief. *Id.* In this determination "[t]he issue is not whether [appellants] will ultimately prevail but whether [they are] entitled to offer evidence to support the claims." *See Maio v. Aetna, Inc.,* 221 F.3d 472, 482 (3d Cir.2000) (citations and internal quotation marks omitted). We review the District Court's decisions to dismiss the complaint with prejudice and deny appellants' request for leave to amend their complaint for an abuse of discretion. *See In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1332 (3d Cir.2002); *Lake v. Arnold,* 232 F.3d 360, 373 (3d Cir.2000).

### IV. DISCUSSION

A. The Record on Appeal

[2] Before we discuss the merits of appellants' claims we address a dispute between the parties concerning whether we should consider certain exhibits that appellants have included in the appendix. Though ordinarily the parties on an appeal do not have a dispute over what documents should be in the record, in this case we address this question because appellants have included two documents in the joint appendix, without our leave, that neither party filed in the District Court and that the Court therefore did not consider, i.e., the February 13, 2008 testimony of Kerry Weems, Acting Administrator for CMS, before the Senate Finance Committee on "Selling to Seniors: The Need for Accountability and Oversight of Marketing by Medicare Private Plans, Part 2" and a December 2009 report the United States Government Accountability Office authored on Medicare marketing. *See* addendum to app. at 1–58. Appellants contend that we should consider these materials as they are a matter of "public record" which "are inextricably intertwined and connected to items that are part of the record...." Appellant's br. at 12–13.

Though we do not doubt the authenticity of these documents, nevertheless we will not consider them because the parties did not present them to the District Court and we do not find any indication in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the record that the Court considered them on its own initiative. *See* Fed. R.App. P. 10(a) (stating that record on appeal is composed of original papers and exhibits filed in district court, transcript of proceedings, if any, and a certified copy of docket entries prepared by district court clerk); Fed. R.App. P. 30 (limiting contents of a party's appendix to record before district court). While we recognize that there might be "exceptional circumstances" which could justify our consideration of these materials even though they were not presented to the District Court, we discern no such circumstances on the appeal. *See Acumed LLC v. Advanced Surgical Servs., Inc.,* 561 F.3d 199, 226 (3d Cir.2009).

[3] We recognize that appellants argue that we should take judicial notice of the two documents as they are part of the **\*303** "public record." Appellant's reply br. at 2. Although a court of appeals may take judicial notice of a matter of public record not presented to the district court when reviewing the disposition of a motion to dismiss under Rule 12(b)(6), *see, e.g., Papasan v. Allain,* 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 2935 n. 1, 92 L.Ed.2d 209 (1986), we think that ordinarily a court of appeals should not take judicial notice of documents on an appeal which were available before the district court decided the case but nevertheless were not tendered to that court, the precise situation here. FN10 *See Zell v. Jacoby–Bender, Inc.,* 542 F.2d 34, 38 (7th Cir.1976) (refusing to take judicial notice of documents filed in companion case to undermine trial court's findings where to do so would violate rule that appellate court must consider only record before trial court). Therefore, we will make our analysis by considering only the record that the parties made in the District Court for that Court's consideration of appellees' motion to dismiss. FN11

FN10. Weems testified before appellants filed this action and the Accountability Office submitted the December 2009 report after appellants filed the action but before the District Court decided the case.

FN11. We add, however, that even if we expanded the record to include the two documents our result on this appeal would not be different.

B. The False Claims Act

1. FERA Amendments

At this early point in our discussion we consider a recent amendment to the FCA. On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub.L. No. 111–21, 123 Stat. 1617 (2009), which amended the FCA and re-designated 31 U.S.C. § 3729(a)(1) as 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(2) as 31 U.S.C. § 3729(a)(1)(B). The pre-FERA version of the FCA, imposed liability on:

[A]ny person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. § 3729(a)(1)-(2).

The FCA as FERA has amended it, now imposes liability on:

[A]ny person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]

31 U.S.C. § 3729(a)(1).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). For purposes of this case both versions of the FCA define a claim in pertinent part as a "request or demand ... for money or property that ... is presented to an officer, employee, or agent of the United States...." 31 U.S.C. § 3729(c) (pre-FERA); 31 U.S.C. § 3729(b)(2)(A)(i) (post-FERA). FERA contains a retroactivity provision which applies only to section 3729(a)(1)(B), and provides that that clause "take [s] effect as if enacted on June 7, 2008, and appl[ies] to all claims under [the FCA] that are pending**304 on or after that date." FN12 Pub.L. No. 111–21 § 4(f)(1), 123 Stat. at 1625.

> FN12. Congress adopted the term "material to," as well as the retroactivity provision, in response to the Supreme Court's June 9, 2008 decision in *Allison Engine Co. v. U.S. ex rel. Sanders,* 553 U.S. 662, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008), which Congress viewed the Court as having decided incorrectly. *See* S.Rep. No. 111–10, at 11 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430, 437–39 ("To correct the Allison Engine decision ... in section 3729(a)(2) the words 'to get' were removed striking the language the Supreme Court found created an intent requirement for false claims liability under that section. In place of this language, the Committee inserted the words 'material to' a false or fraudulent claim."). In *Allison Engine,* the Supreme Court held that a plaintiff "must prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim." 553 U.S. at 665, 128 S.Ct. at 2126.

Though appellants filed their complaint on July 10, 2008, and their amended complaint on August 5, 2009, they cited to the pre-FERA version of the FCA in both their original and amended complaints. Nevertheless, appellants argued in the District Court that the addition of "material to" in section 3729(a)(1)(B) made it easier to state a claim under the FCA inasmuch as, under the amended version of the FCA, a relator only need show that compliance with the applicable regulations which the defendant allegedly violated would have a tendency to influence the Government's payment decision. The Court, though assuming that the amendment applied in this case, held that Congress' addition of a materiality requirement did not change the meaning of the FCA. Appellants do not contend that the Court erred in this conclusion but they do argue that the original complaint "clearly alleged a time period were [sic] claims would be pending on June 7, 2008." Appellants' br. at 16 n. 17. Appellees argue that the majority of courts considering the applicability of the retroactivity provision have determined that the retroactivity provision does not apply to cases which were pending on June 7, 2008. FN13 Appellees' br. at 9 n. 6 (citing *Hopper v. Solvay Pharm., Inc.,* 588 F.3d 1318, 1327 n. 3 (11th Cir.2009)). FN14

> FN13. This is a puzzling argument inasmuch as this case was not pending on June 7, 2008.
>
> FN14. At least one district court has held that FERA's retroactivity provision violates the Ex Post Facto Clause of the United States Constitution. *See U.S. ex rel. Sanders v. Allison Engine Co.,* 667 F.Supp.2d 747, 756 (S.D.Ohio 2009). Clearly, we need not consider that possibility.

We need not decide whether the earlier or amended version of the FCA is applicable because we conclude that appellants' claims based on appellees' alleged violation of the Medicare marketing regulations cannot survive appellees' motion to dismiss under either version of the statute. Moreover, as we explain later, appellants' claims under the AKS fall only under pre-FERA section 3729(a)(1),

which was still in force at the time that appellees submitted their claims for payment to the Government and at the time that appellants filed this suit. Therefore, we will decide this case under the pre-FERA version of section 3729(a)(1).

2. Establishing a Claim Under the FCA

[4][5] The primary purpose of the FCA "is to indemnify the government-through its restitutionary penalty provisions-against losses caused by a defendant's fraud." *Mikes v. Straus,* 274 F.3d 687, 696 (2d Cir.2001) (citing *U.S. ex rel. Marcus v. Hess,* 317 U.S. 537, 549, 551–52, 63 S.Ct. 379, 388, 87 L.Ed. 443 (1943)). A plaintiff, in order to establish a prima facie FCA violation under section 3729(a)(1), must **\*305** prove that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *U.S. ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 242 (3d Cir.2004) (internal quotation marks omitted); *Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 182 (3d Cir.2001). As we have indicated, a private individual, otherwise known as a relator, may bring a civil action in the name of the United States to enforce this provision of the FCA and may share a percentage of any recovery resulting from the suit. 31 U.S.C. § 3730(b) & (d).

[6][7] There are two categories of false claims under the FCA: a factually false claim and a legally false claim. *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.,* 543 F.3d 1211, 1217 (10th Cir.2008). A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment. *Id.* A legally false FCA claim is based on a "false certification" theory of liability. *See Rodriguez v. Our Lady of Lourdes Med. Ctr.,* 552 F.3d 297, 303 (3d Cir.2008), *overruled in part on other grounds by U.S. ex rel. Eisenstein v. City of New York,* 556 U.S. 928, 129 S.Ct. 2230, 173 L.Ed.2d 1255 (2009). On this appeal, we are concerned only with allegedly legally false claims related to appellees' eligibility to receive payment, as appellants do not contend that appellees did not deliver the services for which they sought payment.

[8][9] There is a further division of categories of claims as the courts have recognized that there are two types of false certifications, express and implied. *See, e.g., Conner,* 543 F.3d at 1217. Under the "express false certification" theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds. *Rodriguez,* 552 F.3d at 303. There is a more expansive version of the express false certification theory called "implied false certification" liability which attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment. *Id.* Thus, an implied false certification theory of liability is premised "on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Mikes,* 274 F.3d at 699; *see also United States v. Sci. Applications Int'l Corp.,* 626 F.3d 1257, 1266 (D.C.Cir.2010) ("Courts infer implied certifications from silence where certification was a prerequisite to the government action sought." (internal quotation marks and citation omitted)).

The United States Court of Federal Claims seems to have been the first court to recognize that there can be implied false certification liability under the FCA. *See Ab–Tech Constr., Inc. v. United States,* 31 Fed.Cl. 429 (Fed.Cl.1994), *aff'd,* 57 F.3d 1084 (Fed.Cir.1995). In *Ab–Tech* the court held that Ab–Tech's submission of payment vouchers to the Government impliedly certified that Ab–Tech was continuing to adhere to the eligibility requirements of a federal small business program in which it was a participant. *Id.* at 433–34. Though the vouchers

did not contain any express misrepresentations, Ab–Tech's failure to honor the requirements of the program rendered it subject to false certification **\*306** liability under the FCA. *Id.* at 434.

[10] While we have held that there can be express false certification liability under the FCA, *see U.S. ex rel. Kosenske v. Carlisle HMA, Inc.,* 554 F.3d 88, 94 (3d Cir.2009), we have not decided whether there can be implied false certification liability under the FCA. *See Rodriguez,* 552 F.3d at 303–04.FN15 However, other courts of appeals have considered this possibility and a majority of those courts, including those in the Second, Sixth, Ninth, Tenth, Eleventh, and District of Columbia Circuits have recognized that there can be implied false certification liability under the FCA. *See Mikes,* 274 F.3d at 699–700; *U.S. ex rel. Augustine v. Century Health Servs., Inc.,* 289 F.3d 409, 415 (6th Cir.2002); *Ebeid ex rel. U.S. v. Lungwitz,* 616 F.3d 993, 996–98 (9th Cir.2010); *Conner,* 543 F.3d at 1217–18; *McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.,* 423 F.3d 1256, 1259 (11th Cir.2005) ; *Sci. Applications Int'l Corp.,* 626 F.3d at 1266, 1269; *but see U.S. ex rel. Hutcheson v. Blackstone Med. Inc.,* 647 F.3d 377, 2011 WL 2150191, at \* 7 ( 1st Cir. June 1, 2011) (declining to employ judicially created categories of express and implied false certification); *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 786 n. 8 (4th Cir.1999) (stating without addressing validity of implied false certification theory under FCA, that its precedent makes the theory "questionable"). We now join with these many courts of appeals in holding that a plaintiff may bring an FCA suit under an implied false certification theory of liability.

FN15. In *Rodriguez* we stated that we have "yet to adopt in a holding the false certification theory, either in its express or implied version." 552 F.3d at 303–04. But, as we have indicated, we later recognized that there can be FCA liability under an express false certification theory and therefore our statement in *Rodriguez* is no longer true.

We adopt the implied false certification theory for liability for several reasons. First, the implied false certification theory gives effect to Congress' expressly stated purpose that the FCA should "reach all fraudulent attempts to cause the Government to pay [out] sums of money or to deliver property or services." S.Rep. No. 99–345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274; *see also United States v. Neifert–White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 961, 19 L.Ed.2d 1061 (1968) ("[T]he [FCA] was intended to reach all types of fraud, without qualification, that might result in financial loss to the government."). Moreover, our ruling is consistent with Congress' stated intent inasmuch as under the implied false certification theory of liability, even in the absence of a false certification of compliance, the Government or *qui tam* plaintiffs successfully may bring an action that holds a claimant liable for submitting legally false claims to the Government:

[A] false claim may take many forms, the most common being a claim for goods or services not provided, or provided in violation of contract terms, specification, statute, or regulation.... [Claims made to Medicare or Medicaid programs] may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program....

S.Rep. No. 99–345, at 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274.

In addition, the language and the structure of the FCA support the conclusion that a claim based on an implied false certification "may constitute [an actionable] false or fraudulent claim." *Shaw v. AAA Eng'g & Drafting, Inc.,* 213 F.3d 519, 531 (10th Cir.2000) (internal quotation marks omitted). "Under § 3729(a)(2), liability**\*307** is premised on the presentation of a 'false record or statement to get a false or fraudulent claim paid or approved.' " *Id.* On the other hand, section 3729(a)(1) requires only that a claimant present "a 'false or fraudulent claim for payment or approval' without the additional element of a 'false record or statement.' " *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Therefore, section 3729(a)(1), when compared with section 3729(a)(2), indicates that a plaintiff can bring a claim under the FCA even without evidence that a claimant for Government funds made an express false statement in order to obtain those funds. *Id.*

[11][12] As several courts of appeals have held, however, the implied certification theory of liability should not be applied expansively, particularly when advanced on the basis of FCA allegations arising from the Government's payment of claims under federally funded health care programs. In particular, the Court of Appeals for the Second Circuit in *Mikes* recognized that the rationale behind *Ab–Tech* "does not fit comfortably into the health care context because the [FCA] was not designed for use as a blunt instrument to enforce compliance with all medical regulations—but rather only those regulations that are a precondition to payment...." *Mikes,* 274 F.3d at 699. Moreover, in *Rodriguez,* although we did not expressly adopt the implied false certification theory, we stated that "[t]o state a claim under [the implied false certification] theory it is necessary to allege not only a receipt of federal funds and a failure to comply with applicable regulations, but also that payment of the federal funds was in some way conditioned on compliance with those regulations." 552 F.3d at 304. Thus, under this theory a plaintiff must show that if the Government had been aware of the defendant's violations of the Medicare laws and regulations that are the bases of a plaintiff's FCA claims, it would not have paid the defendant's claims. *See Conner,* 543 F.3d at 1219–20 ("If the government would have paid the claims despite knowing that the contractor has failed to comply with certain regulations, then there is no false claim for purposes of the FCA."). Absent this requirement, the FCA could turn "into 'a blunt instrument to enforce compliance with all ... regulations' rather than 'only those regulations that are a precondition to payment.' " *Rodriguez,* 552 F.3d at 304 (quoting *Mikes,* 274 F.3d at 699). With these principles in mind, we now will consider appellants' FCA allega-

tions.

3. Violations of Medicare Marketing Regulations

As we already have indicated, appellants contend that United Health personnel engaged in marketing practices which violated several Medicare marketing regulations, including: (1) using marketing flyers and forms that CMS did not approve; (2) engaging in marketing activities in the waiting rooms of clinics and doctors' offices; (3) allowing non-licensed individuals to engage in marketing activities; (4) using an excessive number of sales representatives at presentations in an attempt to "overwhelm the public;" (5) asking persons to raise their hands at Medicare presentations if they were dual eligible for Medicare and Medicaid; (6) chasing people in supermarkets to ask whether they were dual eligible; (7) using agents to engage in door-to-door solicitation; and (8) giving out prizes at Medicare presentations in excess of $15 in value.

The District Court held that appellants' allegations that United Health engaged in illegal marketing did not state a claim for relief under either an express or implied false certification theory. According to the Court, these allegations did not state a claim under an express false certification **\*308** theory inasmuch as appellants failed to plead a single instance of United Health submitting a false claim for payment to the Government: "Without an allegation of a claim, Relators' False *Claims* Act claim is like a battery without a touching, or a defamation without a statement." *Wilkins,* 2010 WL 1931134, at *4, 2010 U.S. Dist. LEXIS 47080, at *14. In support of its holding, the Court cited to our opinion in *Rodriguez,* but appellants and amicus curiae contend that the District Court mischaracterized the holding of *Rodriguez,* and we agree.[FN16]

> FN16. The District Court also cited one of our not precedential opinions but we will not discuss that case. *See* 3d Cir. Internal Operating P. 5.7 ("The court by tradition does not cite to its not precedential opinions as authority.").

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

In *Rodriguez,* we based our holding affirming the district court's Rule 12(b)(6) dismissal of the relators' FCA action on their failure adequately to plead, under an implied false certification theory, that the defendant violated a law or regulation connected to the Government's decision to pay the defendant's claims rather than on the relators' failure to identify a specific claim for payment that the defendant submitted to the Government. 552 F.3d at 304. It is true that to recover under the FCA, we have recognized that *ultimately* a plaintiff must come forward with at least a "single false [or fraudulent] claim" that the defendants submitted to the Government for payment. *U.S. ex rel. Quinn v. Omnicare Inc.,* 382 F.3d 432, 440 (3d Cir.2004). Thus, in *Quinn* we held that the district court correctly granted the defendant's Federal Rule of Civil Procedure 56(f) motion for *summary judgment* based on the plaintiff's failure to identify a single claim for payment to the Government arising from defendant's alleged Medicare fraud. *Id.* But to our knowledge we never have held that a plaintiff must identify a specific claim for payment at the *pleading stage* of the case to state a claim for relief. *See Fowler v. UPMC Shadyside,* 578 F.3d 203, 213 (3d Cir.2009) ( "It is axiomatic that the standards for dismissing claims under Fed.R.Civ.P. 12(b)(6) and granting judgment under ... Fed.R.Civ.P. 56 are vastly different.").

In any event, as appellants correctly point out, the question of whether a plaintiff, at the pleading stage, must identify representative examples of specific false claims that a defendant made to the Government in order to plead an FCA claim properly is a requirement under the more particular pleading standards of Rule 9(b). *See Ebeid,* 616 F.3d at 998–99 (listing cases and noting disagreement among courts of appeals). But here, as we stated above, the District Court explicitly declined to analyze appellants' claims under the pleading requirements of Rule 9(b).

[13] Nevertheless, we see no need to decide whether appellants' marketing claims satisfied the pleading requirements of Rule 9(b), because, despite our rejection of the District Court's reasoning with respect to appellants' claim under an express false certification theory, we will affirm its holding dismissing appellants' claims predicated on the Medicare marketing regulations on the same ground that the Court provided for denying appellants' claims under an implied false certification theory. Thus, we will affirm the District Court's order rejecting appellants' claims predicated on the violation of Medicare marketing regulations because appellants' allegations that appellees violated the regulations do not state a plausible claim for relief under the FCA inasmuch as the Government's payments of appellees' Medicare claims were not conditioned on their compliance with the marketing regulations.

**\*309** As we stated above, to plead a claim upon which relief could be granted under a false certification theory, either express or implied, a plaintiff must show that compliance with the regulation which the defendant allegedly violated was a condition of payment from the Government. *Rodriguez,* 552 F.3d at 304; *Mikes,* 274 F.3d at 698. In determining whether compliance with a regulation was a condition of payment from the Government, courts have distinguished between regulations which are conditions of participation in the Medicare programs and conditions of Government payment of Medicare funds. *Conner,* 543 F.3d at 1220; *Mikes,* 274 F.3d at 697 ("Since the Act is restitutionary and aimed at retrieving ill-begotten funds, it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay."). The Court of Appeals for the Tenth Circuit explained the difference between conditions of participation and conditions of payment: "Conditions of participation ... are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program," while "[c]onditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment." *Conner,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

543 F.3d at 1220.

Appellants assert that 42 C.F.R. § 423.509, pursuant to which CMS may terminate a contract with a Medicare sponsor that fails to comply with the applicable marketing guidelines, demonstrates "[t]he relevancy and materiality of compliance" with the marketing guidelines. Appellants' br. at 23. Indeed, section 423.509 states that "CMS may at any time terminate a contract if CMS determines that the Part D plan sponsor ... [s]ubstantially fails to comply with ... [m]arketing requirements in subpart V of this part." 42 C.F.R. § 423.509(a)(8)(i); 42 C.F.R. § 422.510(a)(11) (same for MA organization). The same regulation, however, provides that before CMS may issue a notice of intent to terminate a Medicare contract it will provide a plan sponsor "a reasonable opportunity of at least 30 calendar days to develop and implement a corrective action plan to correct the deficiencies." 42 C.F.R. § 423.509(c)(1)(i); 42 C.F.R. § 422.510(c)(1)(i). The regulation further provides, in section (c)(2)(iii), an exception for the 30–day correction period if the termination is based on "credible evidence, [that the Plan Sponsor] has committed or participated in false, fraudulent, or abusive activities affecting the Medicare, Medicaid, or other State or Federal health care programs, including submission of false or fraudulent data." 42 C.F.R. § 423.509(a)(4); 42 C.F.R. § 422.510(c)(2)(iii) (referring to 42 C.F.R. § 422.510(a)(4)). The regulation also contains an exception to the requirement that a sponsor be allowed a 30–day correction period where CMS's delay in termination, or the financial difficulties of the Plan Sponsor, pose an imminent and serious risk to the health of the individuals enrolled in the sponsor's plan. 42 C.F.R. § 423.509(c)(2)(i)–(ii); 42 C.F.R. § 422.510(c)(2)(i) –(ii). Thus, sections 423.509 and 422.510 clearly demonstrate that compliance with the marketing regulations is a condition of participation and not a condition of payment as the regulations draw a line between the type of violations which are correctable and, if corrected, will allow the sponsor to continue as a Medicare program participant and the type of violations

which lead to immediate termination of a CMS contract.

Accordingly, the fundamental flaw in appellants' allegations is that the amended complaint does not cite to any regulation demonstrating that a participant's compliance**310** with Medicare marketing regulations is a condition for its receipt of payment from the Government. Nor do appellants cite examples, in case law or otherwise, of the Government seeking recovery of Medicare payments for services that a provider actually performed on the basis that its lack of compliance with marketing regulations rendered those services fraudulent. Appellants offer no evidence beyond a CMS published statement that the guidelines "were developed after careful consideration by CMS of current industry practices, recent advancements in communication technology, and how best to protect the interests of Medicare beneficiaries." Appellant's br. at 21; app. at 210. This statement, however, does not indicate that a participant's compliance with marketing regulations is a condition for Government payment under the federal health care programs. Moreover, we think that it is appropriate for us to presume that the CMS surely develops all of its regulations after careful consideration of these and other relevant factors no matter what it determines should be the consequences of a participant's non-compliance with the regulations.FN17

> FN17. Similarly, appellants contend that Weems' statement, which we have determined is not part of the record on which we will decide this appeal, that "protecting people with Medicare from deceptive or harmful practices is among our highest priorities at CMS," demonstrates the relevancy of the marketing guidelines to the Government's decision to pay Medicare claims. Appellant's br. at 21. However, even if we included that statement in the materials that we consider in deciding this appeal, we would regard the statement as demonstrating only that CMS considers the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

marketing regulations to be very important, but we would not regard the statement as indicating what the consequence of non-compliance should be. After all, as appellees aptly point out, "[p]resumably *all* regulations and agency guidelines have some importance to the government agency, or there would be no purpose for the agency to promulgate them." Appellees' br. at 24.

[14] Further, considering that the Government has established an administrative mechanism for managing and correcting Medicare marketing violations which includes remedies for violations other than the withholding of payment otherwise due, it is clear that, although the Government considers substantial compliance with the marketing regulations "a condition of ongoing Medicare *participation,* it does not require perfect compliance as an absolute condition for receiving Medicare *payments* for services rendered." *Conner,* 543 F.3d at 1221. Furthermore, we think that anyone examining Medicare regulations would conclude that they are so complicated that the best intentioned plan participant could make errors in attempting to comply with them. Moreover, it is ironical that if we allowed appellants, though they are ostensibly acting on behalf of the Government, to bring suit based on United Health's non-compliance with marketing regulations, we would short-circuit the very remedial process the Government has established to address non-compliance with those regulations. "It would ... be curious to read the FCA, a statute intended to protect the government's fiscal interests, to undermine the government's own regulatory procedures." *Id.* at 1222.

Finally, like the District Court in this case and the courts of appeals in *Conner* and *Mikes,* we question the wisdom of regarding every violation of a Medicare regulation as a basis for a *qui tam* suit. *Conner,* 543 F.3d at 1221; *Mikes,* 274 F.3d at 699–700. Federal agencies are unquestionably better suited than federal courts to ensure compliance

with Medicare marketing regulations. In the circumstances, we believe that by permitting *qui tam* plaintiffs to file suit based on the violation of regulations which may be corrected **311** through an administrative process and which are not related directly to the Government's payment of a claim, courts unwisely would shift the burden of enforcing the Medicare regulations to themselves even though the administration of the vast and complicated Medicare program is best left to the administrators.[FN18] In this regard, we point out that if we adopted appellants' broad theory of FCA liability, every time a plan participant's agent gave out a prize worth over $15.00, or asked Medicare participants eligible for Medicaid to raise their hands at a meeting, assuming that these are improper marketing techniques, the agent's conduct could be the basis for a federal court action. We do not think that this is the purpose of 42 C.F.R. § 423.509, 42 C.F.R. § 422.510, the marketing regulations, or the FCA.

> FN18. In reaching this conclusion we point out that administrators sometimes address and resolve problems informally using procedures that courts would not employ.

In sum, inasmuch as compliance with the Medicare marketing regulations is not a condition for Government payment under the federal health insurance programs, the District Court properly dismissed appellants' FCA claims based on appellees' violations of those regulations for failure to state a claim upon which relief could be granted.

4. The Anti–Kickback Statute

The AKS, in relevant part, provides that

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any time or service for which payment may be

made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a–7b(b)(2).FN19

FN19. As part of the comprehensive health care legislation Congress enacted in 2010, it amended the AKS to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub.L. No. 111–148 § 6402(f), 124 Stat. 119, 759 (to be codified at 42 U.S.C. § 1320a–7b(g)). But the PPACA was not in effect at the time of the alleged violations at issue in this case or at the time that appellants filed this action, and there is no indication that Congress intended for the PPACA to apply retroactively. See *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,* —— U.S. ——, 130 S.Ct. 1396, 1400 n. 1, 176 L.Ed.2d 225 (2010) ( "The [PPACA] makes no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed defense to a *qui tam* suit."). Therefore we will not consider this amendment in our analysis of appellants' AKS claims. In the circumstances, though we are aware that there is an ongoing nationwide dispute with respect to the constitutionality of the PPACA, we are not joining in that controversy, at least not at this time.

As we stated above, a prima facie claim under the FCA requires that the plaintiff show that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or **\*312** fraudulent." *Schmidt,* 386 F.3d at 242. We have held that "[f]alsely certifying compliance with the ... Anti–Kickback Act[ ] in connection with a claim submitted to a federally funded insurance program is actionable under the FCA." *Kosenske,* 554 F.3d at 94. Further, in *Schmidt* we stated that "[a] certificate of compliance with federal health care law is a prerequisite to eligibility under the Medicare program." 386 F.3d at 243 (citing 42 C.F.R. § 413.24(f)(4)(iv)).

In dismissing appellants' AKS allegations, the District Court stated that "[r]elators never once alleged that United Health certified compliance with the [AKS], nor did they allege that such compliance was relevant to the Government's funding decisions (if indeed any were made, which Relators failed to allege)." *Wilkins,* 2010 WL 1931134, at \*6, 2010 U.S. Dist. LEXIS 47080, at \*18. Appellants argue that "[a] certificate of compliance with federal health care law is a prerequisite to eligibility under the Medicare Program," *see* appellant's br. at 41 (citing 42 C.F.R. § 413.24(f)(4)(iv)), and argue that they specifically referenced that certificate of compliance in the amended complaint by referring to the Medicare Managed Care Manual which states that a plan sponsor ensures compliance with applicable federal laws, including, specifically, the FCA and the AKS.

The Government, as amicus curiae, supports appellants' position by pointing out that Medicare regulations require MA and Prescription Drug Plan ("PDP") organizations to operate under agreements with CMS which include a provision requiring that the organization comply with the AKS. *See* 42 C.F.R. §§ 422.504(h) ("The MA organization agrees to comply with—(1) Federal laws and regulations designed to prevent or ameliorate fraud,

waste, and abuse, including ... [the AKS]"). United Health responds that the District Court's holding was correct inasmuch as "[n]owhere within the four corners of Relators' Amended Complaint did the Relators allege the nexus between compliance with the AKS and payment to a Medicare Advantage plan contractor...." Appellees' br. at 34.

The issue of whether appellants properly pleaded an FCA claim based on United Health's express false certification of compliance with the AKS presents a close question. Yet we cannot ignore appellants' pleading in their amended complaint that "[e]ach month ... United Defendants certify to CMS its continued compliance with all of the CMS MA Guidelines and based on such certification, United Defendants continues [sic] to receive the monthly capitation payments." App. at 31. Moreover, in the next section of the amended complaint, appellants summarized the applicable Medicare regulations and pleaded that an MA Organization may not provide "[a]ny incentive that might have the effect of inducing enrollees to use a particular provider, practitioner or supplier cannot [sic] violate 1128A(a)5 [sic] of the Social Security Act and the corresponding regulations related to the federal anti-kickback statute." *Id.* at 32. Further, appellants alleged that AmeriChoice paid $27,000 to the Reliance Medical Group to induce the owners of the clinic to change dual eligible beneficiaries from Horizon Blue and move them to AmeriChoice, and that AmeriChoice agents enticed doctors into receiving additional income if they provided agents with names of the physicians' patients. Arguably, these allegations state a claim for relief under an express false certification theory inasmuch as appellants allege that appellees falsely certified compliance with the AKS in order to receive monthly payments from the Government.

**\*313** [15][16] But we need not decide whether the amended complaint states a claim under an express false certification theory because appellants' allegations in the amended complaint clearly state a claim for relief under an implied false certification

theory of liability. Under an implied false certification theory, instead of looking at the defendant's representations to the Government, "the analysis focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *Conner,* 543 F.3d at 1218. Accordingly, we conclude that the District Court's holding that because appellants failed to allege in their complaint that United Health certified its compliance with the AKS their AKS claim must fail is incorrect when we analyze the amended complaint under an implied false certification theory of liability. To plead a claim for relief under an implied certification theory, appellants were required to allege, as they did, that appellees submitted claims for payment to the Government at a time that they knowingly violated a law, rule, or regulation which was a condition for receiving payment from the Government.

We reach our conclusion because appellants' amended complaint meets the implied false certification standards for liability as they alleged that appellees received payment from the federal health insurance programs despite their knowing violation of the AKS. Moreover, unlike the plaintiffs in *Rodriguez,* 552 F.3d at 304, appellants alleged that compliance with the AKS was an express condition of payment to which appellees agreed when they entered into an agreement with CMS. *See* app. at 31–32; 37–38 (stating that "Compliance with CMS MA Guidelines ... are express conditions of payment" and stating that the AKS is part of the MA Guidelines). We conclude that appellants, in stating a plausible claim for relief at this stage of the proceedings for their complaint to survive a Rule 12(b)(6) motion, need not allege a relationship between the alleged AKS violations and the claims appellees submitted to the Government.[FN20] Rather, the complaint is sufficient to survive a Rule 12(b)(6) motion to dismiss because appellants have pleaded that appellees knowingly violated the AKS while submitting claims for payment to the Government under the federal health insurance program. *See Ebeid,* 616 F.3d at 998 ("Implied false certific-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ation occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim.").

> FN20. We emphasize again that we are not reviewing these claims under the particularized pleading standards of Rule 9(b).

[17] We disagree with the District Court to the extent that it held that compliance with the AKS was not a condition for payment from the Government under the federal health insurance program. Compliance with the AKS is clearly a condition of payment under Parts C and D of Medicare and appellees do not refer us to any judicial precedent holding otherwise. In fact, the precedents hold the opposite. *See, e.g., Kosenske,* 554 F.3d at 94 ("Falsely certifying compliance with the Stark or Anti–Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA."); *McNutt,* 423 F.3d at 1259–60; *Conner,* 543 F.3d at 1223 n. 8 (listing cases). Indeed, as both amicus curiae and **\*314** appellants point out, Medicare regulations specifically name the AKS as a statute that is "designed to prevent or ameliorate fraud, waste, and abuse." 42 C.F.R. §§ 422.504(h), 423.505(h).

We have not overlooked appellees' argument that our holding will transform the FCA into a strict liability statute in which "every participant in the Medicare program impliedly certifies each time it submits a claim for payment to the program that the claim does not arise from some payment arrangement that—however attenuated, immaterial, and unknowing—could be characterized as a violation of the AKS." Appellees' br. at 36. Rather, we consider but reject this argument. First, the AKS does not prohibit all payment arrangements related to federal health care programs as the statute contains several safe harbor provisions allowing such arrangements. *See* 42 U.S.C. § 1320a–7b(b)(3)(A) –(F). Further, contrary to appellees' argument, a de-

fendant could not be held accountable for an "unknowing" illegal payment arrangement inasmuch as the AKS explicitly requires that for any payment to induce a person to refer an individual for the furnishing of healthcare services to be unlawful it must be made knowingly and willfully.

In order to avoid FCA liability under an implied certification theory, participants making claims to the Government under the federal health care programs have to ensure that they are not violating the federal health care laws which they agreed to follow when they entered into contracts with CMS. As we made clear above, for purposes of the FCA, this compliance does not require perfect adherence to regulations which are not prerequisites to payment from the Government. Compliance, however, does require a participant in a federal health care program to refrain from offering or entering into payment arrangements which violate the AKS, while making claims for payment to the Government under that program. We do not think this is an unreasonable requirement to impose on federal health care contractors, for as Justice Holmes once wrote: "Men must turn square corners when they deal with the Government." *Rock Island, A. & L.R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920). And as the United States as amicus curiae points out, "[t]he Government does not get what it bargained for when a defendant is paid by CMS for services tainted by a kickback." Amicus curiae br. at 31. Therefore, we hold that appellants, by alleging that appellees violated the AKS while submitting claims for payment to a federal health insurance program, have stated a plausible claim for relief under the FCA.

C. Amendment of the Complaint

[18] Appellants argue that the District Court erred by dismissing the case with prejudice. In this regard, they contend that if the Court found the amended complaint to be deficient, it should have dismissed the case without prejudice. Of course, this argument now is partially moot as we are reversing the District Court's order with respect to ap-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

pellants' AKS claim. But we nevertheless address the contention because the argument remains germane with respect to the marketing claims. On the merits, we are satisfied that appellants do not provide a convincing argument that the District Court, to the extent that we hold that it correctly dismissed the complaint, abused its discretion by dismissing it with prejudice instead of without prejudice, nor do they explain how if permitted to amend they could cure the deficiencies that we have identified in their complaint. In making this point we observe that when a district court allows plaintiffs the opportunity**\*315** to amend a complaint so that they can survive a Rule 12(b)(6) motion, it is implicit in the court's ruling that if the plaintiffs seek to amend the complaint they will do so only in good faith and allege facts that they believe they can prove. FN21 Accordingly, appellants' failure to explain how they could have amended the complaint to cure its deficiencies is a critical omission.

> FN21. We are not suggesting that appellants have acted or would act in bad faith and have made or would make allegations that they did not believe. In fact, we do not doubt that appellants believe that they can prove the allegations they already have made, and, if permitted to amend their complaint again, would be able to prove their new allegations.

Appellants also argue that the District Court misconstrued their statement in their reply to appellees' motion to dismiss that "[i]n the event that the Court concludes that the Complaint does not meet the standards of Rule 9(b), Relator requests that he be provided the opportunity to amend the Complaint...." Appellants' br. at 43. Appellants argue that the amended complaint adequately pleaded the causes of action and that "[t]he request was made *only if, and subject to,* the Court concluding, after a review of United's [Motion to Dismiss] and the Relator's [sic] opposition, that deficiencies existed." *Id.* at 44.

[19] Whatever appellants' intentions were in asking the District Court to permit them to amend their complaint, we agree with that Court that the request, without an attached amended complaint, was not the proper method for appellants to seek to amend their complaint. *See Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.,* 482 F.3d 247, 252 (3d Cir.2007) (stating "that a failure to submit a draft amended complaint is fatal to a request for leave to amend"). Therefore, to the extent that appellants requested leave to amend their complaint, the Court did not abuse its discretion by denying their deficient request to amend nor did it abuse its discretion by not granting them leave to amend sua sponte. *Id.* To the extent, if any, that the Court misunderstood appellants' request to amend their complaint, that circumstance has no bearing on this appeal. Should appellants on the remand submit another request to amend their complaint in any respect, it will be up to the District Court to decide whether to grant them leave to amend their complaint, and in making that determination to consider the procedural appropriateness and substantive merits of the request. *See* Fed.R.Civ.P. 15(a).

### V. CONCLUSION

For the foregoing reasons, we will affirm the portion of the District Court's May 13, 2010 order which dismissed appellants' FCA allegations based on appellees' violation of Medicare marketing regulations and will reverse the order insofar as it grants appellees' motion to dismiss appellants' amended complaint based on its allegations that appellees submitted false claims to the Government by violating the AKS. We will remand the case to the District Court for further proceedings consistent with this opinion. On remand, the District Court should rule on appellees' Rule 9(b) contention raised in their motion to dismiss with respect to the portion of appellants' reinstated amended complaint. The parties shall bear their own costs on this appeal.

C.A.3 (N.J.),2011.
U.S. ex rel. Wilkins v. United Health Group, Inc.
659 F.3d 295

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

659 F.3d 295
**(Cite as: 659 F.3d 295)**

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.